Julius F. KLEIN, Petitioner-Appellant,

v.

Harold SMITH, as Superintendent of the
Attica Correctional Facility, Attica, New
York, Respondent-Appellee.

No. 584, Docket 76–2107.

United States Court of Appeals,
Second Circuit.

Argued March 22, 1977.

Decided May 3, 1977.

Lawrence W. Kessler, Hempstead, N. Y., for petitioner-appellant.

Charles M. Newell, Asst. Dist. Atty., Suffolk County, Riverhead, N. Y. (Henry F. O'Brien, Dist. Atty., Kevin J. Crowley, Asst. Dist. Atty., Suffolk County, Riverhead, N. Y., of counsel), for respondent-appellee.

Before MESKILL, Circuit Judge, MARKEY, Chief Judge,* and MOTLEY, District Judge.**

MOTLEY, District Judge:

Julius F. Klein appeals from two orders of the United States District Court for the Southern District of New York (Owen, J.). The first order, dated October 15, 1974,

---

* Hon. Howard T. Markey, Chief Judge, U. S. Court of Customs and Patent Appeals, sitting by designation.

** Hon. Constance Baker Motley, Judge, U. S. District Court for the Southern District of New York, sitting by designation.

denied petitioner's application for a writ of habeas corpus after an evidentiary hearing; the second order, on July 20, 1976, reaffirmed the 1974 order after a reopened evidentiary hearing. We affirm.

Petitioner Klein is presently serving a life sentence in a New York state prison, having been convicted on October 15, 1969 of murder in the first degree after a jury trial in the Supreme Court, Westchester County.[1] His conviction was affirmed without opinion by the Appellate Division, Second Department on December 20, 1971, and was further affirmed without opinion by the New York Court of Appeals on February 14, 1973.

On October 9, 1973, petitioner filed his application for a writ of habeas corpus in the District Court. Insofar as here relevant, he alleged in his moving papers that his conviction had been obtained in violation of his rights to the effective assistance of counsel and to due process of law. By opinion of December 12, 1973, Judge Ward ordered that a hearing be held on the petitioner's claim. Such a hearing was held before Judge Owen on four days in the spring of 1974. Judge Owen denied the writ in an opinion filed on October 15, 1974. Petitioner then filed a notice of appeal to this court, but the matter was returned to the District Court for determination of a motion to reopen the hearing because of newly discovered evidence. Judge Owen granted that motion on April 29, 1976. The hearing was held on four days in the spring and early summer of 1976, and, on July 20, 1976, Judge Owen orally reaffirmed his denial of the writ. The facts developed in the hearings are set forth below.

On February 20, 1969, William Reuther was arrested and charged with the 1966 murder of one Irene Brandt. He was incarcerated in the Suffolk County Jail and remained there at least through October of 1969.

Reuther engaged the New York City law firm of Bobick and Deutsch to represent him. Within a few weeks of his arrest, however, he lost confidence in his attorneys and sought to make a deal with the prosecutor in charge of the case, Maurice Nadjari, then Chief Assistant District Attorney of Suffolk County. Nadjari initially refused to make any deal, indicating that Reuther would have to "tell all he knew" about the Brandt murder in order to receive any kind of favorable consideration. After considering Nadjari's position, Reuther agreed to testify before the grand jury and at trial concerning the Brandt murder in return for the prosecutor's agreement to accept a plea of guilty to first degree manslaughter and to recommend a sentence of from two to four years. As a result of this agreement, Reuther testified before the grand jury in March. On March 22, 1969 petitioner Klein was indicted for the same crime.

Klein also retained Bobick and Deutsch to represent him.[2] Evidently counsel anticipated that both defendants would be tried together. Neither Nadjari nor Reuther informed Bobick or Deutsch of the fact of Reuther's cooperation until mid-September of 1969, some two weeks prior to the date of trial. Mr. Nadjari did inform Reuther that, since he had decided to plead guilty in return for his cooperation, he would, at some point before trial, have to secure other counsel to avoid any possible conflict of interest. However, he felt under no obligation to inform *defense counsel* of such a possible conflict. For his part, Reuther refused to immediately discharge Bobick and Deutsch, on the ground that alleged threats

---

1. Petitioner was tried in Westchester County after the venue of his case had been changed from Suffolk County on his motion.

2. Klein and Reuther were clearly acquainted with each other before they were indicted for Irene Brandt's murder. As a matter of fact, although Judge Owen made no finding on the question, there was some evidence in the record that Klein may have approached Bobick and Deutsch to represent Reuther, rather than Reuther independently retaining his own counsel. In any event, it is clear that Mr. Bobick had represented both Reuther and Klein on criminal matters prior to this murder indictment. In view of our disposition of the case, we do not find it crucial to determine who instituted the representation arrangement for whom in this case.

communicated to him from Klein, who was in custody at the Clinton Correctional Facility in Dannemora, New York, had made him afraid that his life would be in jeopardy if his cooperation were disclosed.

During the period from his February indictment and arraignment until he discharged his attorneys on September 24, 1969 and requested court-appointed counsel, Reuther met with his attorneys on numerous occasions, when they made the 100 mile trip from their offices in New York City to the Suffolk County jail. During the same period of time, he also met with representatives of the Suffolk County District Attorney's office, both in the jail and also in the District Attorney's office. At no time prior to September 20, 1969, when he refused for the first time to meet with his attorneys, did Reuther give either Mr. Bobick or Mr. Deutsch any inkling of his past or prospective cooperation with the prosecutor.

■ Reuther's activities with respect to his attorneys, on the one hand, and the prosecutorial staff, on the other hand, were the subject of some factual dispute at the hearing before Judge Owen. In the face of conflicting testimony from Reuther, Bobick and Deutsch, Judge Owen credited Reuther's testimony that he had never discussed with his attorneys either his or Klein's defense strategy for the impending murder trial. Judge Owen apparently found credible Reuther's explanation that the bulk of the conference time was devoted to preparation for Reuther's defense in an unrelated kidnapping case. Despite his counsel's general assertions that they discussed all aspects of the murder defense, Judge Owen credited Reuther's explanation that he was merely assured that the lawyers "would take care of everything". Such a finding by the trial judge, so inextricably dependent upon first-hand observation of the witnesses at the hearing, should clearly not be disturbed by this court. Rule 52(a), Fed.R. Civ.P.

Judge Owen also found credible the testimony of both Reuther and Nadjari to the effect that they never discussed with each other petitioner Klein's defense plans or strategy. Moreover, at the hearing, Judge Owen specifically asked Mr. Nadjari the following question:

Q. With respect to the meetings that you had with Reuther, did you learn indirectly from any of your staff, any of your detectives, the substance of any conversations that Reuther had with his attorneys in which they were telling him, according to their testimony, how they proposed to defend the case?

Mr. Nadjari responded as follows:

A. No, your Honor. As a matter of fact, Reuther had indicated to me I think it was at the first meeting that Bobick was not really representing Reuther, he was representing Klein, and he felt that Bobick was going to railroad him.

In view of the fact that petitioner had made no sufficient showing that Reuther had communicated any information to Nadjari concerning petitioner's defense strategy, Judge Owen found no evidence of any prejudice to petitioner's defense and, consequently, no violation of his constitutional rights.

The allegations of Klein's original petition for a writ of habeas corpus dealt only with the alleged impropriety of Reuther's continuing representation by Bobick and Deutsch while he was cooperating with the prosecutor.[3] In the course of the hearing, however, petitioner's counsel sought to develop testimony relative to the activities of another figure, one William O'Gorman, allegedly an informant for the District Attorney's office.

The evidence at the 1974 hearings indicated that O'Gorman was a friend of Reuther, that he was a codefendant with Reuther in a then-pending felony charge in Suffolk County, and that he had served as

---

**3.** Other issues were raised by the petition, but Judge Owen's rulings on those issues are not assigned as error in this appeal.

an informant for the Suffolk County District Attorney's office from 1968 through at least 1969. Viewed in a light most favorable to petitioner, the testimony also indicated that O'Gorman had related to his "contact" on the police force, Captain John Gallagher, the substance of one conversation between Mr. Bobick and himself, and that he had given some unspecified "information" to Gallagher concerning the Klein murder case. However, Gallagher specifically denied ever receiving any information concerning petitioner's defense plans either from O'Gorman or from anyone else.

The evidence at the 1974 hearing also showed that O'Gorman had driven Mr. Bobick to the homes of several potential witnesses for the defense case; that O'Gorman had met with Reuther on a number of occasions while the latter was incarcerated; and that O'Gorman had told Reuther, allegedly on behalf of petitioner, that "If you don't keep your mouth shut you're a dead man". (It was this alleged threat which had convinced Reuther that he should not reveal his cooperation with the prosecutor to his own attorneys until virtually the eve of trial.) Finally, there was testimony from one Charles Lucchetti[4] that O'Gorman had supplied him with a tape recorder belonging to the Suffolk County Police Department in February of 1970 for the purpose of surreptitiously recording a conversation between himself and Mr. Bobick, petitioner's counsel. Lucchetti testified that he recorded such a conversation, and gave a copy of the tape to either O'Gorman or then-Lieutenant Gallagher. At the meeting at which he turned over the tape, moreover, Lucchetti said that he heard O'Gorman discuss with Gallagher the fact that he had been paid $5000 to frame petitioner Klein.[5] As indicated previously, however, Gallagher categorically denied that he had ever received any information from O'Gorman, Lucchetti, or any other source concerning petitioner Klein's defense plans. Moreover, he specifically de-

nied that the tape of Mr. Bobick produced by Lucchetti contained any information concerning Klein's defense plans.

At the conclusion of the 1974 hearings, and particularly while ruling on a number of objections to the admission of the above evidence concerning O'Gorman's alleged activities, Judge Owen expressed doubt as to its relevance to the issue presented by Klein's petition, i. e., the intrusion into the attorney-client relationship at the murder trial. While he clearly viewed the allegations as serious ones, he indicated that they appeared to go beyond the scope of the issues for the hearing. Moreover, he took note of the fact that petitioner produced no evidence that any information concerning petitioner's defense plans was ever obtained by O'Gorman and transmitted to the prosecution. Apparently concluding that Klein had produced no substantial evidence concerning O'Gorman's activities which related to the subject matter of the petition, Judge Owen made no reference to O'Gorman in his Memorandum and Order of October 15, 1974 denying the petition for a writ. The discussion concerning the Sixth and Fourteenth Amendment claim focused on the relationship of Reuther to Klein, as above set forth.

Following completion of the 1974 hearings, counsel for petitioner applied for a reopening of the evidentiary hearing on the ground of newly discovered evidence. In support of the application were submitted affidavits of petitioner, his new counsel, his son-in-law, and his wife. The gist of the application was that evidence had come to light indicating more clearly that O'Gorman was an informant deliberately planted by the prosecution in the defense camp to obtain information concerning defense plans.

The nature of this allegedly newly discovered evidence is important to our disposition of this appeal.

---

4. Lucchetti was, at the time of the hearing, serving a federal sentence for bank robbery.

5. At the hearing, Gallagher's recollection of the conversation concerning the $5000 was strikingly different. Instead of recalling that O'Gor-

man said that he had been paid to frame Klein, he recalled hearing that petitioner Klein's father had offered O'Gorman and Lucchetti $5000 to testify *in favor of* petitioner.

Two affidavits were submitted by petitioner's counsel. The first affidavit summarized the information obtained concerning O'Gorman's activities as gleaned from the 1974 hearings, and purported to complete the picture of his alleged nefarious activities on the basis of the evidence proffered in the accompanying affidavits. The thrust of petitioner's argument was that the testimony previously adduced concerning his activities could be buttressed and put into correct perspective by the information contained in the other affidavits.

The second affidavit submitted by counsel consisted almost entirely of his hearsay accounts of his conversations with Mr. O'Gorman. Specifically, he alleged that he had interviewed O'Gorman on July 2, 1975, and that O'Gorman had admitted stealing from Mrs. Klein and others a letter purportedly written by petitioner which outlined in detail the witnesses who would be called to establish his alibi defense. O'Gorman was not quoted, however, as saying that he had delivered the letter to the prosecutor or one of his agents. Counsel further represented that O'Gorman had said that he had never been contacted by a representative of the Suffolk County District Attorney's office concerning the 1974 hearings, and that the representation made by a member of that office that he (O'Gorman) had in 1974 indicated that he would not testify at petitioner's hearing due to his Fifth Amendment privilege was false.

Mrs. Klein's affidavit averred that O'Gorman had acted as a "friend" of her husband during the period when his murder case was being prepared for trial, and that he had both driven potential witnesses to Bobick's office and also driven Bobick to witnesses' homes. Furthermore, Mrs. Klein described the circumstances of what she thought to be the destruction by O'Gorman of the previously described alibi letter. (According to the hearsay account by O'Gorman, however, that episode was merely a ruse to conceal his theft of the letter.)

The affidavit submitted by petitioner's son-in-law recounted a conversation with O'Gorman on January 1, 1976 in which

O'Gorman allegedly told him that petitioner's conviction was the product of a frame-up in which he was instrumental and which was concocted by prosecutor Nadjari. The details of the alleged scheme were not recounted.

The final attached affidavit, in which petitioner was the affiant, purported to describe a meeting between petitioner, O'Gorman, and Assistant United States Attorney Joseph Jaffe in Mr. Jaffe's office on or about September 5, 1974. At the time of the meeting, Mr. Jaffe was the Chief of the Official Corruption Unit of the United States Attorney's Office for the Southern District of New York. According to petitioner's affidavit, the purpose of the meeting was to explore his claim that the Suffolk County District Attorney's office had denied him a fair trial by inducing O'Gorman to make false statements to the presiding judge at the trial.

The affidavit recounted that Mr. O'Gorman had admitted to Mr. Jaffe that he had been instructed by prosecutor Nadjari to make a false report to the trial judge that petitioner or a member of his family had bribed, or attempted to bribe, a juror on the case. The result was that the jurors were interviewed by the judge to investigate the report.

The affidavit further recounted that O'Gorman had said that Gallagher had tape recorded a conversation between himself and petitioner in Clinton Correctional Facility prior to the indictment of Reuther, and then had subsequently altered the tape to make it appear that petitioner intended to testify against Reuther. O'Gorman also allegedly told Jaffe that he had been instructed by Nadjari to threaten Lucchetti with further indictments if he cooperated with the defense. According to the affidavit, he also told Jaffe that he had been instructed by Nadjari to infiltrate the defense camp to ascertain the identities of potential defense witnesses in order that Nadjari's office could contact them before defense counsel were able to do so.

The affidavit also averred that O'Gorman claimed to have in his possession tape re-

cordings of conversations between Nadjari and himself in which he was offered "a benefit" for cooperating with the District Attorney's office to convict petitioner.

Finally, petitioner's affidavit claimed that the letter he had prepared relating to his alibi defense contained the crucial information that he and one Owen Osterman had been together when one Cook, an acquaintance, had approached them and said "the girl is dead." According to petitioner's affidavit, Osterman's testimony concerning that encounter would have been a key part of his case. However, petitioner averred that Cook had been shown the letter *by Nadjari* and that Cook had then threatened Osterman's life, successfully persuading him not to testify in petitioner's behalf. In his affidavit, petitioner did not indicate any independent knowledge of how the letter allegedly wound up in Nadjari's hands, nor did he reveal the source of his information concerning the alleged contacts between Cook, Osterman, and Nadjari.

In the face of these allegations, Judge Owen agreed to reopen the evidentiary hearing which he had concluded some two years previously, primarily in order to hear the testimony of O'Gorman.

When he was called to testify on May 27, 1976, however, O'Gorman invoked his Fifth Amendment rights in response to the first question asked, i. e., whether, prior to February of 1969, he had known petitioner. After the judge had conferred briefly with O'Gorman off the record, he indicated that he was convinced that the situation was such as to entitle him to have legal counsel before he was asked to answer further questions. Accordingly, the hearing was adjourned until June 18, 1976.

Upon resumption of the hearing, O'Gorman indicated that in 1968–1969, he had been incarcerated in the Suffolk County jail on both grand larceny and kidnapping charges and that, as a result of his arrest by then-Lieutenant Gallagher, he had become an informant. However, he stated that, prior to the Klein murder trial, his sole cooperative activity consisted of agreeing to testify against petitioner in a kidnapping case in which he was a co-defendant. When asked whether he had taken a letter to Reuther in jail which indicated that Klein would testify against him, O'Gorman again invoked his Fifth Amendment privilege. After conferring with O'Gorman and his counsel, Judge Owen sustained the witness' invocation of privilege over the objection of petitioner's counsel. Shortly thereafter, O'Gorman again refused to answer when asked whether he participated in a discussion during February or March of 1969 between Mr. Bobick and the previously mentioned Mr. Osterman concerning petitioner's anticipated defense in the impending Brandt murder trial. The hearing came quickly to a close without any further testimony from O'Gorman.

When the hearing was resumed, Assistant United States Attorney Jaffe was called by the court to testify as to his recollection of his conversation with O'Gorman and petitioner as mentioned in the previously described affidavit executed by petitioner. Based upon his notes, and his own recollection of the interview,[6] as sharpened by discussion with an investigator who had also been present, he painted a very different picture of the allegations made by O'Gorman at that time.

As recalled by Jaffe, O'Gorman indicated that he had told the trial judge that the Klein family was happy with the jury and that he did not say that Nadjari had told him to lie. He did not recall any mention by O'Gorman of altered tapes. Nor did the tapes which O'Gorman ultimately presented to him, in support of his allegation that the prosecutor had tried to frame petitioner, contain what they were said to contain. Jaffe had no recollection that O'Gorman ever indicated that the was a "spy" in the defense camp for the prosecution. He did not recall that O'Gorman ever said that Nadjari had told him to spy on Mr. Bobick.

---

**6.** Which he placed on June 13, 1974, rather than September 4, 1974 as alleged in petitioner's affidavit.

Finally, Jaffe remembered that O'Gorman had alluded to some letter which he had intercepted from petitioner's attorney, but Jaffe had never seen it.

In sum, insofar as he had any recollection of the conversation, Mr. Jaffe contradicted most of the material allegations made in petitioner's affidavit concerning the statements purportedly made by O'Gorman at that meeting. Furthermore, he volunteered his own observation that O'Gorman was not a credible witness. Judge Owen made clear, however, that he was taking the testimony of Mr. Jaffe only for the limited purpose of making some determination as to Mr. O'Gorman's credibility, given the fact that he had chosen to invoke his Fifth Amendment privilege. Judge Owen made it clear that he considered Mr. Jaffe's testimony completely inadmissible on the substantive allegations of prosecutorial misconduct.

O'Gorman was once against called to the stand. When asked whether he had prepared and signed a letter sent to a friend of his, one Mario Silvestri, in which he alleged that petitioner had been framed, O'Gorman again invoked his Fifth Amendment privilege. Although O'Gorman admitted being in petitioner's attorney's office during the year 1969, he refused to answer a series of questions concerning whether he had discussed petitioner's defense with Mr. Bobick; whether he had provided any defense information to the District Attorney; and whether he received any consideration from Mr. Nadjari in return for his cooperation with the District Attorney.

O'Gorman did admit making statements under oath to Mr. Nadjari in affidavit form on January 31, 1975. However, he again asserted his constitutional privilege, and was again sustained in his assertion by Judge Owen, when asked whether he recalled certain statements in the affidavit which, in general, tended to deny any wrongdoing or impropriety between O'Gorman and the prosecutor. Judge Owen made quite clear at the hearing that he was considering the contents of the affidavit, not for their probative value concerning the ultimate issue of prosecutorial misconduct, but rather as they shed any light upon the veracity of Mr. O'Gorman.

Following O'Gorman's appearance on the stand, Judge Owen drew the hearing to a close. Orally delivering his findings, he denied petitioner's motion to reconsider his initial denial of a writ of habeas corpus. As he viewed the matter, the main reason for reopening the hearing was to take the testimony of O'Gorman who, of course, invoked his Fifth Amendment privilege in response to most of the questions put to him. However, the judge clearly indicated that "the only thing that this case has gotten down to is whether or not there is enough here bearing upon Mr. O'Gorman's believability to warrant giving any consideration to this at all. The farther we get into this case in my judgment, the worse Mr. O'Gorman's believability gets."[7] Judge Owen found that, in view of Mr. O'Gorman's lack of credibility, there was no evidence before him which would warrant either a further factual inquiry or the granting of a writ of habeas corpus. He specifically found insufficient the extensive letter purportedly written from O'Gorman to Silvestri, since he did not find O'Gorman credible, since he found that O'Gorman had a motive to lie *in favor of* petitioner, and since the letter itself could not be cross-examined. He therefore was not persuaded by the allegations of the letter indicating that petitioner had been framed, that O'Gorman had transmitted defense information to the prosecutor, and had otherwise sought to undermine petitioner's defense at the behest of the prosecution.

### Discussion

█ Based upon this record, which we have found it necessary to recount in some detail, petitioner urges that Judge Owen applied an erroneous legal standard in making his determination that petitioner had not established a violation of his Sixth and Fourteenth Amendment rights. Specifical-

7. Transcript of July 20, 1976 hearing, p. 135.

ly, petitioner framed the issue on appeal in the following terms: "Once appellant proved intentional intrusion by an agent of the prosecutor into the lawyer-client relation, was the District Court correct in requiring petitioner to prove that the agent transmitted prejudicial information when proof of transmittal necessitates that the prosecutor admit to committing a criminal act?" Petitioner urged below, and again urges here, that under the facts of this case, the District Court should not have required him to show that he was prejudiced by the activities of the prosecutor or his "agents", but rather that it should apply a *per se* rule in cases of allegedly egregious intrusion into the attorney-client relationship and automatically vacate the conviction of the petitioner.

Whether, in some cases, such a *per se* rule might be appropriate we need not decide because we do not feel that it is required in this case. On the basis of the most recent pronouncement of the Supreme Court concerning the right to the effective assistance of counsel, *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), we find no impermissible intrusion into the attorney-client relationship in this case.[8]

*Weatherford* was a case in which an undercover agent responsible for the arrest of one Bursey was also arrested and charged as a codefendant with Bursey in the case in order to preserve his undercover status. The agent, to continue to maintain his "cover", hired his own attorney. On two occasions prior to trial, the agent met with his codefendant (Bursey) and the latter's counsel at their request to discuss the approaching trial. With respect to these meetings, the District Court specifically found that the agent did not seek information from Bursey or his attorney, nor did he initiate the meetings. Nor did the agent discuss with or pass on to his superiors or to the prosecuting attorney or any members of his staff any information whatsoever concerning Bursey's trial strategy or any aspect of the criminal action pending against him. Although the agent later testified against Bursey at trial concerning his undercover activities and the facts constituting the alleged offense, the District Court found that Bursey's right to the effective assistance of counsel had not been violated by any actions of the undercover agent.

On appeal, the Court of Appeals for the Fourth Circuit reversed, holding that, on the facts as found by the District Court, Bursey's right to effective assistance of counsel and a fair trial had been violated. The Court of Appeals held that "whenever the prosecution knowingly arranges and permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." *Bursey v. Weatherford*, 528 F.2d 483, 486 (1975). The fact that the intrusion had occurred in order to prevent revealing the agent's identity as an undercover agent was deemed immaterial.

The Supreme Court reversed. In an opinion representing the views of seven members of the Court, Justice White rejected the Fourth Circuit's *per se* rule which he found to be an unnecessarily broad prophylactic rule. The Court considered it unrealistic to consider the agent himself a member of the prosecutorial team whose uncommunicated knowledge of Bursey's defense plans was alone enough to violate Bursey's constitutional rights and to vitiate his conviction. The essence of the Court's holding appears to be that, at least where the intrusion by an "agent" of the prosecution is unintentional or justifiable, there must be some communication of valuable information derived from the intrusion to the prosecutor or his staff in order that there can appear some realistic possibility of prejudice to the defendant. In so holding, the Court rejected many of the arguments for a *per se* rule made by the petitioner in the instant case. The Court did not believe "that federal or state prosecutors will be so

---

**8.** The Court's decision in *Weatherford* was released after the briefs in this case had already been filed. Therefore, the parties only addressed that case at oral argument. Both par-

ties appeared to agree that *Weatherford* was controlling, although they, naturally, disagreed concerning its implications for the facts of this case.

prone to lie or the difficulties of proof so great that we must always assume not only that an informant communicates what he learns from an encounter with the defendant and his counsel but also that what he communicates has the potential for detriment to the defendant or benefit to the prosecutor's case." 429 U.S. at 556, 97 S.Ct. at 844.

We feel that this holding is clearly dispositive of petitioner's contentions concerning the activities of Reuther. Even if we consider Reuther to be an "agent" of the prosecution by virtue of his agreement to testify against petitioner before the grand jury and at trial, we find no abuse by the prosecutor in allowing him to continue to be represented jointly by petitioner's counsel for some six months without disclosing to Mr. Bobick the fact of his cooperation with the District Attorney. We consider that Reuther's concern for his own safety justified the delay in notifying Bobick of his cooperation, just as the agent's desire to protect his "cover" justified his meetings with Bursey and his counsel in *Weatherford*. Furthermore, Judge Owen specifically found not only that Reuther did not convey to Nadjari any information concerning petitioner's defense strategy, but also that Reuther had gained no such information from Bobick or Deutsch which he could convey. In the face of these explicit findings by the trial judge, we do not find that Reuther's activities in any way infringed upon petitioner's right to the effective assistance of counsel.

Petitioner urges, however, that the *Weatherford* decision does not preclude the application of a *per se* rule on the facts developed regarding the activities in this case of O'Gorman. The Supreme Court did take some pains to distinguish the situation presented by that case from "a situation where the State's purpose was to learn what it could about the defendant's defense

plans and the informant was instructed to intrude on the lawyer-client relationship or where the informant has assumed for himself that task and acted accordingly." *Id.* However, we are not persuaded that O'Gorman's activities automatically require vacation of petitioner's conviction without some showing of prejudice.

We must first recall that Judge Owen found O'Gorman to be an unbelievable person and therefore apparently discounted not only his testimony at the hearing, but also the contents of his writings, including the letter to Silvestri. Therefore, we must examine the remaining evidence concerning his activities to ascertain whether petitioner has met his burden of showing an intentional intrusion into his relationship with his attorney.

That evidence, coming solely from the testimony of *other* witnesses, included the following. According to Captain Gallagher, O'Gorman related to him the substance of one conversation between attorney Bobick and himself, in which Bobick allegedly intimated that he wished to falsely accuse the police of brutality.[9] Gallagher also said that O'Gorman, during the period when he was functioning as an informer, gave him some unspecified "information" concerning the Brandt murder case.[10] Other testimony revealed that O'Gorman, on occasion, drove Mr. Bobick to witnesses' homes;[11] that he visited Reuther while the latter was in jail;[12] that during such a visit he conveyed to Reuther an alleged threat from Klein;[13] and that he, along with Reuther, visited Lucchetti in jail and urged him to join with them in cooperating with the District Attorney in the Brandt murder case.[14] Finally, there was evidence that O'Gorman had indeed accompanied Mrs. Klein and Osterman to a meeting with Bobick at which petitioner's alibi letter had been discussed; that O'Gorman had later taken custody of the letter and purportedly destroyed it, os-

9.  1974 Trans. pp. 309–311.

10.  1974 Trans. p. 303.

11.  1974 Trans. p. 156.

12.  1974 Trans. p. 94.

13.  1974 Trans. p. 117.

14.  1974 Trans. p. 229.

tensibly to prevent it from falling into the wrong hands; and that, by one hearsay account, the letter had later been seen in "Riverhead".[15]

█ We feel that this evidence falls short of establishing that O'Gorman was an informant who was instructed to intrude on the relationship between petitioner and his attorney. At most, it appears to us that petitioner has shown that O'Gorman, an admitted informant in another case, took it upon himself to become closely involved with petitioner's case.

While it is clear that O'Gorman associated with petitioner, his codefendant, and his attorney during the period of trial preparation, we do not feel that petitioner has met his burden of establishing that O'Gorman improperly garnered information concerning petitioner's trial preparation, or that he delivered to the prosecution anything other than "information" which might properly have been used in developing the State's case. Leaving aside O'Gorman's own written and hearsay assertions that he delivered strategic defense information to the District Attorney, which Judge Owen evidently did not choose to credit, the only suggestion that he actually did so is the hearsay account of Cook that he had seen petitioner's alibi letter in "Riverhead". Not only is such a statement inadmissible as an evidentiary matter, but it seems somewhat improbable in view of the fact that O'Gorman's "contact" at the Police Department, Captain Gallagher, denied under oath that he ever received any information from any source concerning petitioner's defense plans.[16] The most that can be said on this record regarding the conduct of the prosecutorial staff is that they did not specifically warn O'Gorman *not* to associate with petitioner and his counsel; there is no admissible evidence that any agent of the prosecution ever solicited O'Gorman's help to infiltrate petitioner's defense camp. There is no admissible evidence that O'Gorman ever transmitted to any agent of the prosecution any information obtained from petitioner or his counsel concerning their defense plans. So far as the evidence shows, the worst that can be said of O'Gorman is that he destroyed a letter containing petitioner's alibi defense, *after* it had already been discussed with his counsel, his wife, and a friend. We do not find these circumstances so offensive as to warrant vacation of a murder conviction absent some showing that petitioner's defense was thereby prejudiced.

█ This is not a case in which it has been shown that privileged communications between attorney and client were intentionally wiretapped, *Coplon v. United States,* 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952), or in which an informant was paid to infiltrate the defense camp to, among other things, ascertain the names of defense witnesses, *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879 (1953), or in which the Government knowingly indicted a "sham" defendant who was in fact a paid government informant before and during his trial with several codefendants. *United States v. Rispo,* 460 F.2d 965 (3d Cir. 1972); *see also, United States v. Lusterino,* 450 F.2d 572 (2d Cir. 1971). Since this court has recently had occasion to review in some detail the case law in this and other Circuits concerning intrusions into the attorney-client relationship, *United States v. Gartner,* 518 F.2d 633 (2d Cir.), *cert. denied,* 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975), we find it unnecessary again to discuss the distinction between those circumstances mandating the application of a *per se* rule of reversal and those less egregious instances of Governmental misconduct in which we require a showing that an aggrieved defendant has been prejudiced by the actions of the Government or its agents. Suffice it to say that we adhere to the views expressed in *Gartner,* and we find nothing in the Supreme Court's decision in *Weatherford*—a decision specifically

**15.** 1974 Trans. pp. 272–7. "Riverhead" denoted the District Attorney's office to the parties in this case.

**16.** 1974 Trans. p. 319.

*not* involving an intentional intrusion—which would mandate application of such a *per se* rule on the facts of this case. Since the burden of proof is on petitioner to establish his entitlement to issuance of the writ, *United States ex rel. Schuster v. Herold,* 410 F.2d 1071, 1085 (2d Cir.), *cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969), we hold that petitioner has not established circumstances justifying application of a *per se* rule in this case.

The remaining assignments of error are directed to various rulings made by Judge Owen which denied petitioner the opportunity to develop further evidence at the 1976 hearings.

Petitioner's principal argument is that Judge Owen erred in upholding O'Gorman's assertion of his Fifth Amendment privilege under the circumstances of this case. Since O'Gorman's role in this case is of pivotal importance to petitioner's constitutional claim, and since O'Gorman refused to testify with respect to virtually all significant questions concerning his activities, we have examined his assertion with great care. We find no error in Judge Owen's ruling however.

■ The role of the trial judge in assessing claims of the Fifth Amendment testimonial privilege is, by now, well established. It is for the judge to make a determination, based not only on the witness' assertion, but also on all the circumstances of the case, whether the witness has reasonable cause to believe that the anticipated answer would support a conviction or would furnish a link in the chain of evidence needed to prove a crime. *Hoffman v. United States,* 341 U.S. 479, 486–7, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *United States v. Llanes,* 398 F.2d 880 (2d Cir. 1968), *cert. denied,* 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969). "The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" *Hoffman, supra,* at 487, 71 S.Ct. at 818 (citation omitted).

■ Neither petitioner nor respondent challenges this conception of the trial court's function. Moreover, it is clear to us from our review of the record in the case that Judge Owen clearly discharged his responsibilities in investigating O'Gorman's claim. Not only did he interrogate O'Gorman himself, but he adjourned the first day of the 1976 hearings to enable O'Gorman to obtain counsel to advise him concerning his assertion of privilege.

Petitioner argues, however, that, as a matter of law, the privilege was inapplicable due to the fact that the bulk of the activities concerning which O'Gorman was interrogated occurred in 1969. Petitioner argues that any state or federal criminal liability flowing from these activities had been extinguished by 1976 due to the running of the relevant statutes of limitation. *See* 18 U.S.C. § 3282 (5 years); N.Y. Criminal Procedure Law § 30.10(2)(b) (5 years). Judge Owen seriously considered this position and required O'Gorman's counsel to outline the basis for his assertion in a robing room conference, the minutes of which were sealed. Having examined the transcript of that conference, we are of the view that Judge Owen was correct in sustaining O'Gorman's invocation of his Fifth Amendment privilege in these circumstances. We cannot say that it was "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness [was] mistaken, and that the answer[s] [could not] possibly have [a] tendency" to incriminate. *Temple v. Commonwealth,* 75 Va. 892, 898 (1881), quoted in *Hoffman, supra,* at 488, 71 S.Ct. at 819. We find it entirely possible that the solicited answers might have formed a "link in the chain" of evidence leading to criminal liability not protected by the statutes of limitation.

■ Petitioner next asserts that the trial court erred in refusing to allow him to call two witnesses: Investigator Doonan of the United States Attorney's office and Justice George Aspland of the New York Supreme Court, who was, at the time of petitioner's trial, District Attorney of Suffolk County. Again we find no error in these rulings.

Doonan was the investigator who had been present with Assistant United States Attorney Jaffe during the interview with O'Gorman and petitioner in 1974. Jaffe had consulted with Doonan prior to testifying at the 1976 hearings in order to refresh his recollection concerning the meeting at issue, since Doonan reportedly had a better independent memory of the events than he did. When Jaffe's testimony revealed only a partial recollection of the meeting, petitioner sought to have Doonan called, but Judge Owen refused to do so. Since the only purpose in calling *anyone* to testify concerning that meeting was to enable the trial judge to form some estimation of O'Gorman's credibility, rather than to acquire substantive evidence concerning the alleged prosecutorial misconduct, we find no error in Judge Owen's refusal to call another witness to testify as to this collateral matter.[17]

■ Similarly, we find no error in Judge Owen's refusal to have Justice Aspland called. Petitioner's counsel indicated that his sole purpose in calling Justice Aspland would be to inquire whether he had ever received a copy of the letter which petitioner had written to Silvestri and in which he alleged that petitioner had been framed. We do not see how this evidence would be relevant to the reopened hearing; even if a copy of the letter had been sent or delivered to the District Attorney, this fact would not be corroborative of the truth of the allegation contained therein, nor would it constitute evidence on the issue of O'Gorman's credibility. Accordingly, Judge Owen acted well within his discretion in excluding this testimony.

■ Finally, petitioner claims that the District Court erred in refusing to sign a writ ordering his production for the reopened hearings in 1976. Since he was a participant in the meeting with O'Gorman and Jaffe which was a crucial topic of inquiry at the hearings, he argues, he should have been produced for the hearings to enable him to consult with his counsel and assist him in the cross-examination of witnesses. *See* 28 U.S.C. § 2243; *United States ex rel. De Fillo v. Fitzpatrick*, 378 F.2d 85, 87 (2d Cir. 1967). It is certainly true that "[w]here . . . there are substantial issues of fact as to events in which the prisoner participated, the trial court should require his production for a hearing." *United States v. Hayman*, 342 U.S. 205, 223, 72 S.Ct. 263, 274, 96 L.Ed. 232 (1952). However, where, as here, those events are collateral to the substantive allegations of constitutional infirmity in the conviction, we do not think that the petitioner must necessarily be produced at every hearing where such issues are aired. The purpose of the reopened hearings in this case was to determine if the alleged statements of O'Gorman were to be given any credence. Since O'Gorman substantially refused to testify and since the rest of the hearings were devoted primarily to an assessment of O'Gorman's credibility regarding his various allegations received in hearsay form, we cannot find that the error, if any, in excluding petitioner from the hearings materially prejudiced his case.

The denial of the writ is affirmed.

---

**17.** It is not without significance that Doonan's recollection apparently differed from Jaffe's only regarding what O'Gorman told them concerning his contact with the trial judge in the case, Judge Serignano. July 13, 1976 trans. pp. 41–3.