UNITED STATES of America, Appellee,

v.

Alan GINSBERG and Carlos Ivan Piedrahita, Defendants-Appellants.

Nos. 318, 319, Dockets 84–1181, 1212.

United States Court of Appeals,
Second Circuit.

Argued Oct. 25, 1984.

Decided March 26, 1985.

Carol B. Schachner, New York City (Raymond J. Dearie, U.S. Atty. E.D.N.Y., Allyne R. Ross, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Irving Anolik, New York City, for defendant-appellant Alan Ginsberg.

Martin L. Schmukler, New York City, for defendant-appellant Carlos Ivan Piedrahita.

Before FRIENDLY, PIERCE and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

## BACKGROUND

This case arises out of a government undercover operation which resulted in an agreement to purchase ten kilograms of cocaine. For their alleged parts in arranging and carrying out that agreement, appellants Carlos Ivan Piedrahita and Alan Ginsberg were tried together as co-defendants and convicted of conspiracy to possess with intent to distribute and possession with intent to distribute a sizeable quantity of high quality cocaine. The other principal actors (and co-defendants of appellants) involved in the conspiracy were Luis Pena-Estrada ("Luis"), Jose Albeiro Pena-Estrada ("Albeiro"), Rhina Toro, Humberto de Jesus Hoyos, Jose Montes-Hernandez, and John Cimino.

The events giving rise to this appeal began in the fall of 1983 when Rhina Toro, at the request of her boyfriend, Albeiro, approached Alan Ginsberg and John Cimino asking if they knew anyone interested in purchasing a large quantity of cocaine. They, in turn, spoke with one Louis Angora ("Sonny"), who approached the New York Drug Enforcement Task Force and proposed that he work for the government as a paid informant. After reaching an agreement with Sonny, Task Force agents instructed him to obtain a sample of the cocaine that would be sold. The Task Force selected Officer Charles Romanolo to

be the undercover agent who would pose as a prospective buyer.

Sometime in late October or early November, 1983, at Sonny's request, Ginsberg arranged a meeting with Sonny at which Rhina Toro and John Cimino were also present. At this meeting, Ginsberg gave Sonny a sample of cocaine that he had obtained from Toro and informed Sonny that if a deal was consummated, the purchaser would have to pay twenty-five dollars for that sample. Ginsberg also stated that the price for each kilogram of cocaine sold would be $37,000.

Several days later, Sonny arranged a meeting at a restaurant in lower Manhattan in order to introduce undercover officer Romanolo to Ginsberg, Toro, and Albeiro. At this meeting, Romanolo asked if the cocaine delivered would be of the same quality as a sample he had received. Toro assured him that it would be and stated that her "husband's" family (i.e. Albeiro's family—Toro and Albeiro were not in fact married) could supply an unlimited amount of cocaine at $37,000 per kilogram. Ginsberg volunteered that at that price, he, Cimino, Toro, and Albeiro would each make $1,000 per kilogram sold. Ginsberg also informed Romanolo that the cocaine was kept at a "factory" in Queens, New York. Romanolo then stated that he would be interested initially in purchasing ten kilograms of cocaine. Following lengthy negotiations, at several meetings, a deal was struck: Romanolo was to purchase ten kilograms of cocaine; Romanolo would pay with ten packets of $37,000 each, in old ten and twenty dollar bills; and each party was to bring someone as "back-up" to protect their respective assets—the cocaine and the cash.

On November 17, 1983, the day arranged for the cocaine purchase, Romanolo and Sonny, along with undercover back-up officers, traveled to a Burger King restaurant on Sixty-ninth Street and Northern Boulevard in Queens, New York. There, while the back-up officers waited in a car in the parking lot, Romanolo and Sonny met with Ginsberg, Albeiro, Toro, and Cimino. Al-beiro explained that he had with him only two kilograms of cocaine and that a "delivery boy" would bring the remainder shortly. After a brief conversation in Spanish with Toro, Albeiro left the restaurant. Surveillance officers observed Albeiro as he went to a bank of pushbutton telephones on Northern Boulevard where he appeared to make several phone calls and to receive one. He then returned to the restaurant and spoke briefly in Spanish with Toro who explained to Romanolo that Albeiro initially would deliver three kilograms of cocaine. If there were no problems, Albeiro would deliver three more kilograms, followed by the final four kilograms. Toro then gave Romanolo the address at which the transfer would be made. As Albeiro left the restaurant, Toro explained that Albeiro would pick up the third kilogram of cocaine on his way to the transfer point. Romanolo asked Toro to accompany him there to act as a translator and further instructed Toro to have Cimino and Ginsberg remain at the restaurant until the transaction was completed. Romanolo and Toro then left and proceeded to the transfer point followed by the waiting backup officers.

Meanwhile, surveillance officers observed Albeiro enter his car and drive one-half block to a three-family residence at # 32–39 Sixty-eighth Street. Albeiro left his car and entered the building empty-handed. A short while later, another car arrived. The driver (later identified as appellant Carlos Ivan Piedrahita) slowed down in front of # 32–39, sounded his horn several times, looked up at the residence and then parked his car. Piedrahita left his car and entered # 32–39 carrying a white plastic "Pathmark" shopping bag which appeared to be weighted with several round objects, the outlines of which bulged against the sides of the bag. A few minutes later, Albeiro left the building carrying a black bag from which a white bag protruded. Shortly thereafter, Piedrahita left carrying nothing, entered his car and drove away, followed by the surveillance officers. Piedrahita circled the area alternately speeding up then slowing down

until the surveillance officers stopped and arrested him. The officers seized from Piedrahita several items including a telephone beeper, a small telephone book containing Albeiro's telephone number, a business card with the access number for another beeper—later found to be that of Albeiro—and a car registration.

Meanwhile, Officer Romanolo and Toro had proceeded to the house at which the transfer of cocaine and money was to take place. Albeiro, along with two other men, Javier Montes-Hernandez and Humberto de Jesus Hoyos, was already present at the house. Albeiro delivered three kilograms of cocaine to Romanolo, and the two then went to retrieve the money that had been left in Romanolo's car. When the two reached the car, Romanolo arrested Albeiro and seized from him a loaded handgun, a telephone beeper, and a card with the access number for Piedrahita's beeper. Other officers entered the house and arrested Toro, Montes-Hernandez and Hoyos. Following these arrests, officers waiting at the Burger King restaurant arrested Cimino and Ginsberg, while other officers waiting at # 32–39 Sixty-eighth Street arrested Luis Pena-Estrada, Rodrigo Pena-Estrada, and Jose Marin Cadavid.

Rodrigo Pena-Estrada and Jose Marin Cadavid, who were illegally in the United States, were deported after testifying before a grand jury. The appellants together with Javier Montes-Hernandez and Humberto de Jesus Hoyos were tried by a jury before Judge Sifton. Albeiro pleaded guilty to narcotics conspiracy, narcotics possession, and weapons charges. Toro pleaded guilty to narcotics conspiracy charges only. Luis Pena-Estrada fled on the eve of trial and was tried and convicted in absentia.

At trial the government presented evidence from which the jury could have found the above-stated facts. In his defense, Piedrahita presented the grand jury testimony of the two deported aliens and argued that they, not he, had delivered the cocaine to Albeiro. Ginsberg rested at the close of the government's case-in-chief and then, along with Piedrahita, moved pursuant to Fed.R.Crim.P. 29 to dismiss the indictment. The trial court considered and denied both appellant's Rule 29 motions, and thereafter turned to a motion by the government to re-open its case in order to present similar act evidence against Ginsberg through the testimony of Rhina Toro. Before trial, the government had put all parties on notice that it would seek to introduce similar act evidence against Ginsberg—though it did not at that time identify the source thereof. The trial court deferred ruling on the admissibility of the evidence until the defense had concluded its case. At that point, considering the government's motion, the court concluded that because Ginsberg—through his cross-examination of Rhina Toro when she testified during the government's case-in-chief and through his Rule 29 motion—had placed in issue his intent, the probative value of the similar act evidence outweighed its prejudicial impact. The court therefore allowed the government to re-open its case and call Rhina Toro as a witness.

Toro testified that Ginsberg had previously been involved in another large cocaine transaction which had resulted in the loss of $40,000. This, Toro explained, was Ginsberg's reason for pursuing the ten kilogram sale to Romanolo. Toro also testified that Luis Pena-Estrada (who was arrested at the # 32–39 Sixty-eighth Street house) was "too big" to handle cocaine himself and that he thus employed a "delivery boy." Toro did not identify this delivery boy. Piedrahita presented surrebuttal evidence attacking this statement. Ginsberg, though he had requested and received permission to present surrebuttal evidence, did not do so.

## DISCUSSION

On appeal, Ginsberg and Piedrahita challenge the legality of their arrests and indictments and allege that several prejudicial errors occurred during their trial. We address first those claims raised by Piedrahita.

## A. *Probable Cause*

Piedrahita contends that he was arrested without probable cause. This contention is without merit. At a crucial juncture in the unfolding of a major cocaine transaction, Albeiro, a principal actor, entered the house at # 32–39 Sixty-eighth Street. Approximately ten minutes later, Piedrahita entered the same building carrying a heavily loaded white plastic bag. A few minutes later, Albeiro left the house carrying a bag that he had not been seen with earlier and from which protruded a white bag. Piedrahita then left the building empty-handed, entered his car, and drove away evasively.

■ Probable cause is "a practical, non-technical concept." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). To establish probable cause, one need not make "a prima facie showing of criminal activity" nor demonstrate that it is more probable than not that a crime has been or is being committed. *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983). Probable cause for arrest "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (citations omitted). Applying these standards to the case at hand, we conclude that the surveillance officers did have probable cause to arrest Piedrahita. The short duration of Piedrahita's visit to the building at # 32–39 Sixty-eighth Street, his arrival with and departure without the heavily loaded white plastic bag, the coincidence of Piedrahita's arrival at the building with that of Albeiro, Albeiro's entrance without and departure with a heavily loaded black bag from which a white plastic bag protruded, combined with Albeiro's role as seller in a major cocaine transaction, and followed by Piedrahita's evasive driving provided "evidence that would give a man of reasonable caution grounds to believe that" Piedrahita had brought the cocaine which Albeiro was to deliver to undercover officer Romanolo. *See United States v. Vasquez*, 638 F.2d 507, 522–23 (2d Cir.1980) (probable cause for arrest of appellant Sanchez found where he: (1) arrived empty-handed at a possible narcotics distribution center; (2) left a few minutes later carrying a shopping bag; and (3) fidgeted nervously and dropped the bag when questioned by police).

## B. *Admission of Co-conspirator Hearsay*

■ Piedrahita next challenges the admission against him of Albeiro's statement (made shortly before he left the Burger King restaurant) that the "delivery boy" had arrived. He claims that the statement should have been excluded pursuant to our decision in *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). We conclude that the trial court properly admitted this statement, and so we reject this contention.

■ Under *Geaney*, statements made by a co-conspirator in furtherance of a conspiracy are admissible against a defendant when the prosecution proves the defendant's membership in the conspiracy by a fair preponderance of independent evidence. *Geaney*, 417 F.2d at 1120. The standard for independent proof of participation is "lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury." *United States v. Alvarez-Porras*, 643 F.2d 54, 57 (2d Cir.), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981). Once the prosecution has shown that a conspiracy exists, the evidence needed "to link another defendant with it need not be overwhelming." *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), (citation omitted), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). The independent evidence need show only "a likelihood of an illicit association between the declarant and the defendant." *United States v. Cicale*, 691 F.2d 95, 103 (2d Cir.1982), *cert. denied*, 460 U.S.

1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983) (citations omitted).

Herein, the evidence, independent of any hearsay, easily established the likelihood of such an illicit relationship between Piedrahita and the other members of the conspiracy. In addition to the evidence that provided probable cause for Piedrahita's arrest, the following independent evidence linked him to the conspiracy: first, police seized from Piedrahita a telephone beeper, a business card containing the access number for Albeiro's beeper, and a telephone book containing Albeiro's phone number; second, police seized from Albeiro a business card containing the access number for Piedrahita's beeper; and third, the government presented testimony of a Drug Enforcement Agency ("DEA") expert that narcotics dealers often use beepers to contact members of their organization. Considering this testimony along with that concerning Albeiro's calls from push button telephones—the type needed to activate Piedrahita's beeper—and the placement of these calls shortly before Piedrahita's arrival at # 32–39 Sixty-eighth Street, the district court reasonably concluded that a fair preponderance of independent evidence showed Piedrahita's participation in the charged conspiracy.

## C. *Sufficiency of the Evidence*

■ Piedrahita next argues that the government presented insufficient evidence to prove his guilt beyond a reasonable doubt. The legal standards applicable to such a claim are well settled. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). If "*any* rational trier of fact could have found the essential elements of the crime," we must affirm the conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781,

2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Under these standards, a defendant challenging his conviction for insufficiency of the evidence faces a heavy burden. *United States v. Gaviria*, 740 F.2d 174, 182 (2d Cir.1984). Reviewing the record in this case, we conclude that Piedrahita has failed to meet this burden.

■ From the evidence already discussed in connection with Piedrahita's probable cause and co-conspirator hearsay arguments, a rational trier of fact could have found: (1) that Piedrahita knew Albeiro and kept in contact with him by beeper; (2) that Albeiro had phoned Piedrahita's beeper and Piedrahita had, in turn, called Albeiro shortly before the latter announced that he would go to pick up the third kilogram of cocaine; (3) that Piedrahita was present when Albeiro obtained the cocaine that he would deliver to Romanolo; and (4) that Piedrahita was conscious of his involvement in an illegal activity and aware of the possibility of surveillance. In sum, the jury could have concluded that Piedrahita was a member of Albeiro's cocaine distribution conspiracy and that, in furtherance thereof, he possessed cocaine with intent to distribute it. In addition to that evidence already discussed, the government presented the testimony of Rhina Toro and Officer Romanolo. Toro testified that Luis Pena-Estrada—the source of the cocaine who was present at # 32–39 Sixty-eighth Street when Albeiro picked up the drug—was "too big" to deliver drugs and thus employed a delivery boy. Officer Romanolo testified that shortly before Piedrahita arrived at # 32–39 Sixty-eighth Street, Albeiro upon returning from placing and receiving telephone calls, stated that the "delivery boy" had just arrived—presumably at the site where the cocaine was stored.[1] This testimony provided the jury with additional evidence of Piedrahita's role in the conspiracy, *viz.*, "delivery boy," and al-

---

1. Piedrahita argues that because he arrived at # 32–39 Sixty-eighth Street after Albeiro made this statement, he could not be the "delivery boy" spoken of. However, the jury apparently rejected this explanation of Albeiro's statement, and we do not sit to weigh evidence or determine the credibility of witnesses. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

lowed it to eliminate Luis Pena-Estrada as a possible candidate for that role. Together with the other evidence presented by the government, this testimony amply supports the jury's verdict finding Piedrahita guilty of both the conspiracy and substantive counts of the indictment.

### D. *Introduction of Hearsay*

 Piedrahita argues that the trial court improperly allowed the introduction of "hearsay testimony that other arrested narcotics dealers explained to the arresting officer the use of beepers and codes like those possessed by appellant [Piedrahita]." The incident of which Piedrahita complains occurred when Detective Walter Alicea began to testify concerning his familiarity with the use of code numbers and beepers. Piedrahita's counsel objected without specifying the grounds therefor. The trial judge, presumably interpreting the objection as one attacking the witness' qualifications as an expert, proceeded to question the witness about the basis of his knowledge. The witness responded that arrested narcotics dealers had told him of the use of codes and beepers. The judge then asked whether there is any difference between codes and beepers used legitimately and those used illegitimately. The witness responded that there is not. He was then allowed to proceed with his testimony. No further objection was made nor was any exception taken. On appeal, Piedrahita now raises for the first time a hearsay objection to this testimony. Even if we were to assume arguendo that Piedrahita did not waive this objection by failing to make a more specific objection or a motion to strike after the trial court's questioning, we nevertheless find the argument to be meritless.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

thereto in the form of an opinion or otherwise.

The trial judge has broad discretion in applying this rule, and we must sustain his actions if they are not "manifestly erroneous." *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.1983). The operations of narcotics dealers are a proper subject for expert testimony under Rule 702. *Id.* We conclude that the trial judge did not err in finding Detective Alicea's testimony regarding beepers admissible. Accordingly, we reject this claim as being without merit.

### E. *Presentation of Hearsay to the Grand Jury*

 Piedrahita argues that his indictment was defective and should be dismissed because the prosecutor presented only hearsay testimony to the grand jury. In *United States v. Estepa*, 471 F.2d 1132 (2d Cir.1972), we held that an indictment must be dismissed when the grand jury is "misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed." *Id.* at 1136-37 (quoting *United States v. Leibowitz*, 420 F.2d 39, 42 (2d Cir.1969)). Here, Piedrahita fails to show that the grand jury was misled into thinking that hearsay testimony was in fact that of an eyewitness.

At the commencement of each session, the Assistant United States Attorney informed the grand jury that some of the testimony presented would be hearsay. Moreover, the grand jury could not have thought the challenged testimony to be anything other than hearsay. The testimony at issue is that of one of the surveillance officers, George Cats. In his testimony, Detective Cats made clear that he had not observed all the events of which he spoke. When asked if he had maintained the surveillance that observed Piedrahita's actions, Cats replied: "The other officer did, yes." In the same passage, the prosecutor refers to "you and other [sic]" establishing surveillance and speaks of "Al" entering the Sixty-eighth Street building. Considering these statements together with those of Detective Cats, we think the

prosecutor could not possibly have misled the grand jury. We therefore reject this argument as meritless.

### F. *Deportation of Alien Witnesses*

Piedrahita asserts that his rights to due process of law, compulsory process, cross-examination, and confrontation were violated by the government's deportation of the two aliens, Jose Marin-Cadavid and Rodrigo Pena-Estrada.

In order to prevail on this point, Piedrahita must make a "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *United States v. Valenzuela-Bernal,* 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982). In addition, he must show that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 874, 102 S.Ct. at 3450. Piedrahita's argument fails this test.

Before their deportation, both alien witnesses testified at grand jury proceedings. At trial, Piedrahita read their testimony to the jury. The first alien, Jose Marin-Cadavid, testified that he arrived at #32–39 Sixty-eighth Street at about 1:00 p.m. on the day in question. According to Cadavid, at that time he met a stranger at the front door—identified as Luis Pena-Estrada. Cadavid asked Luis if he was a relative of Ana Pena-Estrada—who lived in the apartment—but Luis did not respond. The two men then proceeded in silence to the apartment where Luis and Ana talked in the living room while Cadavid remained seated at the dining room table. Cadavid testified that he did not overhear the conversation between Luis and Ana. A few minutes after their arrival at the apartment, the police arrived and arrested Cadavid and Luis. The second alien, Rodrigo Pena-Estrada, testified before the grand jury that he left the apartment before noon and was then arrested. Pena-Estrada stated that he never saw Piedrahita or Luis Pena-Estrada.

Essentially conceding that this testimony is in no way helpful to him, Piedrahita argues that there exist certain inconsistencies in the two alien witnesses' testimony and "that these inconsistencies evidenced consciousness of their guilt for the crimes attributed to appellant." Piedrahita further contends that "[t]he inconsistencies could only be lies to cover the suspects' [Rodrigo Pena-Estrada and Cadavid] own complicity" and that "either or both of these men could have been the delivery boys." Had the deported witnesses' testimony supported Piedrahita's imagined scenario, he might satisfy the first prong of the *Valenzuela-Bernal* test by showing "that the testimony of the deported witnesses would have been material and favorable to his defense." However, the testimony of the two men before the grand jury—i.e., that they had no involvement with Albeiro or Piedrahita and that Cadavid had met Luis, but only on the day of the arrest—directly conflicts with Piedrahita's hypothesis, and he offers no reason to believe that at trial their testimony would have differed significantly. Moreover, we disagree with Piedrahita's implied assumption that to satisfy the *Valenzuela-Bernal* test he can simply posit the testimony most helpful to him that the deported witnesses could provide. We believe that he must show some reasonable basis to believe that the desired testimony would be both helpful and material to his defense. *See United States v. Schaefer,* 709 F.2d 1383, 1386 (11th Cir.1983). Piedrahita has failed to make such a showing here and we therefore dismiss his argument as meritless.

Having considered the arguments made by Piedrahita and having found them to be meritless, we now turn to those issues raised by his co-appellant, Ginsberg. Ginsberg presses two arguments in this appeal: first, Ginsberg argues that the evidence submitted at trial does not support his conviction on the second count of the indictment—i.e., possession with intent to distribute cocaine; and second, he contends that the government, by allowing its cooperating witness, Rhina Toro, to "mingle" with

the defense, violated his sixth amendment right to counsel.

### A. *Ginsberg's Conviction for Possession of Cocaine*

As noted, the second count of the indictment under which Ginsberg was convicted charged him with possession with intent to distribute cocaine. Ginsberg argues that the district court should have dismissed this count because the government presented no evidence showing that he at any time had either actual or constructive possession of any drugs. There is no merit to this argument.

 Putting aside evidence of Ginsberg's actual possession of the sample of cocaine that he delivered to Sonny—which in itself would establish Ginsberg's possession with intent to distribute cocaine—the government presented ample evidence to support his conviction under the second count of the indictment. Title 18 U.S.C. § 2 (1983) provides that anyone who aids, abets, or causes a crime is punishable as a principal. To be guilty of aiding and abetting possession with intent to distribute narcotics, one need not ever have actual or constructive possession of the drug.

> In order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.

*Nye & Nissen Corp. v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949) (citation omitted). Here, the evidence demonstrates that Ginsberg not only sought out a buyer for cocaine and made the initial introduction of Sonny to Albeiro and Toro but also was present at each stage of negotiations. He informed Romanolo that he (Ginsberg) would earn $1,000 for each kilogram of cocaine sold, and he delivered to Sonny for transfer to Romanolo the sample of cocaine. Ginsberg's active participation in the conspiracy sufficiently establishes that he associated himself with the illegal venture with an intent to make it succeed, and this amply supports his conviction for possession with intent to distribute cocaine.

### B. *Right to Counsel*

Ginsberg claims that the government violated his right to counsel by allowing Rhina Toro—an unrevealed cooperating witness—to "mingle" with the other defendants prior to trial. More specifically, Ginsberg argues that the government concealed Toro's cooperation from the other defendants until trial thereby allowing her to sit at the defense table during pre-trial court conferences and eat lunch with the defendants, all the while acting as a "spy in the defense camp."

Ginsberg and the other defendants first discovered that Toro was cooperating with the government when at trial, the prosecution announced that she would be called as a witness. At that time, counsel for co-defendant Luis Pena-Estrada stated that since Toro's arrest and her grand jury testimony on behalf of the government, there had been "at least three, four, or five Court conferences on this case" and during those proceedings "Rhina Toro was sitting here at defense table with the other defendants." Luis' counsel also observed that "on at least one occasion [he had] conferred with her attorney" and that, during court appearances, Toro had heard arguments counsel urged on behalf of his client. On this showing, Luis' counsel requested that the court

> hold some sort of hearing whether formal or informal as to why the Government allowed Ms. Rhina Toro, after she became a cooperating witness, to sit on several occasions with the defense—with the defendants and have her attorney sit with the other defense counsel.

The trial judge responded by observing that this proffer did not warrant a hearing, but he nevertheless invited counsel to "make some more formal presentation as to why there ought to be a hearing." He also stated that he would not grant a hearing "on the basis of this presentation."

The following day, Ginsberg's counsel joined in the request for a hearing on Toro's role. The trial judge again noted the insufficiency of the proffer made and invited counsel to make a more complete, formal motion in writing. Despite the court's invitation, defense counsel submitted no written application nor did he raise the issue in any other manner during the remainder of the trial.

We agree with the district judge that defense counsel made no offer of proof that would warrant holding a hearing. Unquestionably, government interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). However, assuming that the government does not deliberately interfere in the relationship between defendant and counsel, the mere presence of a government agent, informant, or cooperating witness at conferences between defendant and counsel does not violate the sixth amendment. *Weatherford v. Bursey*, 429 U.S. 545, 554–59, 97 S.Ct. 837, 843–45, 51 L.Ed.2d 30 (1977); *cf. Massiah*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246.

We note that under *Weatherford*, 429 U.S. at 548–49, 97 S.Ct. at 840, 41, the need to maintain the confidentiality of an informant's identity is a legitimate law enforcement objective. The record here establishes that the purpose of the government's "intrusion" was both "legitimate" and "justifiable" under *Weatherford*. Prior to trial, the government submitted to the district court an *ex parte* application for an order permitting deferral until trial of any discovery that would disclose the identity of Rhina Toro as a cooperating government witness. The request was supported by a detailed affidavit substantiating the government's allegation that disclosure of Toro's informant status would place her life in danger.

Where the presence of the government's agent or informant at the defense conference is either unintentional or justified by the necessity of protecting the informant's identity, there can be no violation of the sixth amendment without some communication of valuable information derived from the intrusion to the government: absent such communication, there exists no realistic possibility of either prejudice to the defense or benefit to the government. *Weatherford*, 429 U.S. at 558, 97 S.Ct. at 845; *Klein v. Smith*, 559 F.2d 189, 197 (2d Cir.), *cert. denied*, 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977). Under these standards, to make out a violation of his sixth amendment rights, Ginsberg would need "to establish that privileged information [was] passed to the government or that the government . . . intentionally invaded the attorney client relationship, and resulting prejudice." *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir.1979). To require a hearing on his sixth amendment claim, Ginsberg's proffer would need to allege facts which, if proven, would constitute a violation under this standard. We therefore hold that, to require a hearing on a claimed sixth amendment violation resulting from unintentional or justifiable presence of a government informant or agent at an attorney-client conference, a defendant must allege specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom. Allegations that a prosecution witness testified concerning privileged communications, that prosecution evidence originated in such communications, or that such communications have been used in any other way to the substantial detriment of the defendant would meet this standard. Additionally, we note that if the defense attorney considers it necessary, in order to protect confidential communications from further disclosure, he may request that the court review the allegations supporting his motion *in camera.*

Turning to the case at hand, we note that the offer of proof made by Ginsberg's counsel alleged essentially only the presence of a government informant at defense conferences. Under the standard

discussed above, this offer of proof is insufficient to require a hearing. We therefore reject Ginsberg's sixth amendment argument.

For the foregoing reasons, we affirm the judgments of conviction.