**UNITED STATES of America**

**v.**

**Joseph MASSINO and Robert Lino, Defendants.**

**No. 02–CR–307(NGG).**

United States District Court, E.D. New York.

March 15, 2004.

Barry Levin, Garden City, NY, Joseph R. Benfante, David Breitbart, David Breitbart, Attorney at Law, David Stern, Rothman, Schneider, Soloway & Stern, P.C., Flora Edwards, New York, NY, for Defendants.

Greg D. Andres, Jim Walden, U.S. Attorney's Office, Criminal Division, Brooklyn, NY, for Plaintiff.

## MEMORANDUM AND ORDER

GARAUFIS, District Judge.

On February 19, 2004, Joseph Massino moved the court to suppress and seal consensual recordings made between one of his then attorneys, Scott Leemon, and James Tartaglione, a cooperating witness for the government.[1] On February 25, 2004, Massino requested a full evidentiary hearing to determine the "extent of the damage done to the Massino defense strategy" due to the recordings which he alleges are evidence of prosecutorial misconduct. February 25 Letter from Massino ("ML2") at 3. In this letter, Massino moves to dismiss the indictment, or, in the alternative, to disqualify the government's lead attorney, Greg Andres, to preclude Tartaglione from testifying, and to expedite discovery of all 3500 material. On February 26, 2004, Robert Lino joined this motion for an evidentiary hearing. February 26 Letter from Robert Lino at 2. On March 5, 2004, Massino supplemented his motion to dismiss the indictment with transcriptions of particular segments of the tape which he alleges illustrate the government's misconduct. Finally, on March 11, Massino submitted a final reply. The government responded to the defendants' motions on February 27, 2004 and on March 8, 2004.

I have read all of these letters, listened to and read transcriptions of the tapes, and reviewed material *in camera*[2] including the work product of and affidavits from prosecutors and FBI agents regarding the scope of Tartaglione's cooperation and the

---

1. In response to the government's February 6, 2004 motion to disqualify, Leemon withdrew as Massino's co-counsel on February 20, 2004.

2. Throughout the memorandum and order, I cite to certain portions of sealed documents or to documents that I have reviewed *in camera*. To protect the parties' rights and privacy, and to avoid exposing a party's work product,

government's "firewall." [3] On March 5, in open court, I held that the government did not intentionally invade the defendants' relationships with counsel and that no confidential defense strategy was revealed. Transcript of March 5, 2004 ("Tr.3/5") at 11. At that time and despite my own findings to the contrary, I gave the defendants an opportunity to submit papers to prove that defense strategy was divulged. Based on Massino's submission, I find that no actual or arguable defense strategy was divulged, and that no prejudice resulted from the information that the government learned in reviewing the case. Thus, for the following reasons, the defendants' motions to dismiss the indictment, disqualify Greg Andres, preclude Tartaglione's testimony at trial, and expedite discovery of all 3500 materials are DENIED. The defendants' motion to seal and suppress the tapes until the charges against them are resolved is GRANTED.

## I. Background

On February 6, 2004, the Government moved to disqualify Scott Leemon from representing Joseph Massino due to a conflict of interest. Government's Motion to Disqualify ("MD"). This conflict became known to the government when Tartaglione, who had been a longtime client of Leemon, decided to cooperate with the government. Tartaglione chose to be represented by another lawyer while negotiat-

ing his cooperation because he believed that Leemon was passing messages among members of the alleged Bonnano crime family of La Cosa Nostra ("Bonnano family"). *Id* at 2. Tartaglione reported to the government that Leemon contacted him in order to deliver a message from Massino spoken through Massino's cell mate, another client of Leemon's. The government then began to investigate Leemon's involvement with the Bonanno family. *Id.* In order to assist in the government's investigation of Leemon's alleged role as a conduit for messages between Massino and the alleged Bonnano family members at liberty, Tartaglione made consensual recordings of his meetings with Leemon. At this time, Leemon was not yet representing Massino. *Id.*

As the court has learned from internal government documents it reviewed *in camera*, and from testimony in open court, the government was aware of the potential harm to the defendants' Sixth Amendment rights that might result if it initiated the consensual recordings and, in the process, learned privileged defense strategy. To protect against this potential "spy in the defense camp" issue, the government created a "firewall" to ensure that only prosecutors and FBI agents not working on the Massino trial would have access to the tapes' contents.[4] *Id.* The United States Attorney's Office submitted internal memoranda for my review. As they were sub-

---

I refer only to materials that are necessary to explain my decision. Many of these statements or facts to which I refer were made public by the parties themselves during the hearings on March 3 and 5.

3. The term "firewall" refers to a procedure the government created to ensure that no prosecutors or FBI agents actually working on the case·had access to the recordings or to Tartaglione for debriefing.

4. The timeline of events as gleaned through the parties' submissions, testimony during the hearings on March 3 and 5, and internal work

documents that I reviewed *in camera* is as follows: In January 2003, Leemon began meeting with Massino at the Metropolitan Detention Center. Transcript of March 3, 2004 Hearing ("Tr.3/3") at 49. On April 7, 2003, Tartaglione contacted the government about a possible cooperation agreement and met with the government on April 11, 2003. Ruth Nordenbrook Affirmation, reviewed *in camera*. Aware of the potential "spy in the defense camp issue," the government instituted a firewall procedure on April 28, 2003 prior to any recordings being made. This procedure kept all prosecutors and FBI agents on the Massi-

mitted under seal, I will not describe the details of the procedure. Suffice it to say, however, that I find these procedures were adequate in insulating all members of the Massino trial team, both the attorneys and the FBI agents, from learning about the contents of the consensual recordings either by listening to them or by debriefing the witness.

Because the Massino trial team had no access to these tapes, the motion to disqualify Leemon was based entirely on information external to the recordings or the debriefings of Tartaglione. MD at 2. One of Massino's attorneys, however, requested the tapes in order to prepare his opposition to the government's motion to disqualify Leemon. Transcript of Sealed Hearing of February 12, 2004 ("Tr.2/12") at 3. In response, the government also requested permission to hear the tapes; if Massino's defense team could hear them, the government argued, so should the prosecutors. *Id.* at 28. Prior to making this agreement in a sealed proceeding in chambers on February 12, 2004, Massino's lead counsel, David Breitbart, waived Massino's right to keep the government from learning evidence or strategy that might be discussed on the tapes. *Id.* Specifically, Breitbart stated:

> We'll waive. If the firewall should be lifted, let it be lifted. If I listen to them

and they want the firewall lifted, the defense—the prosecution team has an absolute right to listen to the tapes. I have no objection to it … And we will raise no objection during the course of the trial with regard to the tapes.

*Id.* at 28–29. Pursuant to this waiver, the court ordered on February 12, 2004 that the tapes be made accessible both to Breitbart and to the government's Massino defense team. At first, the Massino prosecution team, much like this court, found that the tapes revealed very little and moved only to keep them sealed and to suppress. February 19 Letter from Massino ("ML1") at 2 ("It is significant that the five recordings themselves are of minimal relevancy to the offenses for which Mr. Massino is charged.") Having had more time to strategize, however, Massino moved the court, as explained above, to dismiss the indictment and to hold an evidentiary hearing to determine the scope of harm caused by the tapes' release. ML2. In order to determine if an evidentiary hearing was necessary, I reviewed government work product and affidavits detailing Tartaglione's cooperation and the consensual recordings. As a result, on March 5, 2004, I found that the firewall was adequate, that the government did not coerce Leemon into divulging any defense strategy and that, in fact, no defense strategy actually was divulged.[5]

no trial team from listening to the recordings and from debriefing Tartaglione. U.S. Attorney's Office Internal Memorandum re Firewall Procedures, reviewed *in camera.* On May 6, 2004, Tartaglione made his first consensual recording. February 27, 2004 Letter from the Government ("GL1") at 2. Leemon entered an appearance on behalf of Massino on May 13, 2003. March 11 Letter from Massino ("ML4") at 1.

5. On March 5, 2004, I made this finding in open court. Specifically, I held that the "government was aware" of the potential "spy in the defense camp" problem and created a procedure to ensure that the AUSA's and the

FBI agents assigned to the Massino case would have no access to the contents of the tapes and would not debrief the witness after his meetings with attorney Scott Leemon. I find that the government created a sufficient firewall to protect the integrity of the trial and that it followed firewall procedures. I find that the government remained unaware of the tapes' contents until February 12, 2004, when I made the tapes available to both Mr. Massino's attorneys and to the AUSA's on the trial team pursuant to Mr. Breitbart's waiver. I also will address briefly the defendant's allegation that the government coerced Mr. Leemon through its cooperating witness to divulge secret defense strategy. I find that

When I made this finding on March 5, however, I offered the defendants the opportunity to submit evidence to the court showing that the government learned privileged defense strategy upon listening to the tapes, and that prejudice resulted from such knowledge. On the same day, Massino filed a sealed motion which he copied to the government, detailing the defense strategy that allegedly was revealed, and claiming that such evidence proved prosecutorial misconduct. March 5 Letter from Massino ("ML3") at 6–8.

## II. Sixth Amendment Claim

### A. The Standard for a Successful "Spy in the Defense Camp" Claim

Underlying the prosecutorial misconduct claim is an allegation that the government has violated the defendants' Sixth Amendment right to counsel by rendering their representation ineffective.[6] The Supreme Court considered a similar claim in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In *Weatherford*, an informant for the government joined in meeting with his codefendant, Bursey, and Bursey's lawyer. *Id.* at 548, 97 S.Ct. 837. Weatherford was invited to the meetings by Bursey's lawyer, and did not communicate any information he learned in those meetings to the prosecuting attorneys. *Id.* Weatherford attended those meetings for the legitimate purpose of maintaining his cover, not because the government planted him as a spy. *Id.* at 557, 97 S.Ct. 837. The Court held that Bursey's Sixth Amendment rights were not violated by Weatherford's presence at those meetings because there was "no tainted evidence in the case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford ..." *Id.* at 558, 97 S.Ct. 837.

The Second Circuit applied Weatherford's holding in *United States v. Ginsberg*, 758 F.2d 823 (2d Cir.1985). In *Ginsberg*, the plaintiff claimed that his representation was rendered ineffective due to the presence of an undercover cooperating witness at pre-trial conferences and lunch with his co-defendants. *Id.* at 832. The court found that the presence of a cooperating witness at a defense meeting does not violate the Sixth Amendment so long as the witness' attendance is justified, and the witness does not "deliberately interfere in the relationship between defendant and counsel." *Id.* at 833 A cooperator's presence is justified if it is necessary protect the informant's identity. *Id.* As set forth in *Ginsberg*, to prove a violation of Sixth Amendment rights, the defendant "would need to establish that privileged information [was] passed to the government or that the government ... intentionally invaded the attorney client relationship, and resulting prejudice." *Id.* (internal quotations deleted).

### B. Contents of the Tapes

 To establish a Sixth Amendment violation, the defendants thus would have to show either that privileged information was passed to the government and prejudice resulted, or that the government intentionally invaded the attorney client relationship and prejudice resulted. On March 5, 2004, I found that the stringent firewall procedures proved that the government did not intentionally invade the attorney-client relationship of the defendants. Tr. 3/5 at 11–12. I now make the

---

the allegations are unsupported ... Additionally, I find no indication that the government improperly caused the witness to initiate contacts with Mr. Leemon during the period that the recordings were made." Tr. 3/5 at 11–12.

6. In pertinent part, the Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall ... have the assistance of counsel for his defense." U.S. Const. amend. VI.

additional finding that Tartaglione's consensual recordings were justified to protect the informant's identity. On March 5, I found that the government did not improperly cause Tartaglione to contact Leemon, and that, on the contrary, Leemon himself initiated many conversations with the Tartaglione. *Id.* I also held that there is no evidence that the government, acting through Tartaglione, coerced Leemon into representing Massino in order to learn about defense strategy. *Id.*

Also on March 5, Massino filed a letter under seal on behalf of himself and Lino objecting to my finding, based on my own review of the tapes and transcripts, that no actual or arguable defense strategy was divulged. *Id.* The defendants' letter identifies fifteen segments of the tapes in which they assert that Leemon reveals defense strategy to Tartaglione, and thus to the government. So as not to further publicize what the defendants believe is privileged information, I will not describe in detail the statements included in the letter. Having carefully reviewed them, however, I find no reason to modify my initial holding. My reasoning is as follows: First, Leemon predicts on the tape that Tartaglione will be indicted, and that the indictment will be separate from the one under which Massino is charged. Thus, even though Leemon passed information to Tartaglione that pertained in general to Bonnano family affairs, he had no reason to describe and, in fact, did not describe Massino's defense strategy. There is no evidence on the tapes that Tartaglione attempted to learn about Massino's defense strategy. The vast majority of the state-

ments that Massino submitted to the court for review show only that Tartaglione and Leemon discussed cooperating witnesses and the individuals in the Bonnano family whom they believed committed crimes. None of these statements reveal privileged defense strategy.

The one possible exception to this finding that no strategy was revealed is a statement Leemon allegedly makes on the tape about "structure." [7] As evidence that the government learned privileged defense strategy from the recordings, Massino claims that on the recording from May 6, 2003 "Leemon tells the CW 'we are going to concede structure. We can't fight structure' and Joey knows that." ML3 at 7. If Breitbart had not previously stated in open court that the recordings revealed this same information, neither the court nor the government would have known that strategy regarding structure was communicated on the recordings. This is because in the transcript version of the tapes, which render the completely inaudible recordings somewhat intelligible, the same conversation is transcribed as follows:

> CW: I don't know if Joey could really hurt him, only for the obstruction, between you and I.
>
> SL: It happens, this is still, obstruction with (UI).[8] How are you gonna prove obstruction? And Joey knows that. And now there is this whole thing (UI).

Transcript of Recordings at 17. Even if this constitutes defense strategy that Leemon revealed to Tartaglione on the

---

7. Although the tapes, transcripts and surrounding motions remain sealed, the court believes that this comment regarding "structure" can be discussed in this Memorandum and Order as Breitbart made the same claim in open court on March 3, 2004. During that hearing, Breitbart stated that "one of the principal things that was disclosed in the first

conversation was the fact that we're not going to contest structure. We saved them hundreds of hours of work." Tr.3/3 at 65.

8. UI is the way in which the FBI agents who transcribed the tapes labeled statements on the tapes that are "unintelligible."

consensual recordings, it would not have become known if Massino and his attorney had not voluntarily made it known to the court and the government long after the recordings were made. Having reviewed Massino's March 5 submission, I confirm my finding that no privileged information about defense strategy was passed to the government through these consensual recordings. Because I find that no privileged defense strategy was communicated, I also hold that no prejudice resulted.

### C. A Valid Waiver

 I am confident that the informant did not communicate any defense strategy to the government. Assuming for the sake of argument, however, that the tapes do reveal strategy, I find that Massino's attorney, David Breitbart, made a valid waiver of his client's right to maintain the government's firewall.

In *New York v. Hill,* 528 U.S. 110, 115, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000), the Supreme Court held that counsel may waive certain rights of the defendant, and, with respect to such waivers, "[a]bsent a demonstration of ineffectiveness, counsel's word on such matters is the last." Similarly, the Second Circuit divides criminal defendants' rights into two categories, and applies a different waiver standard to each. *See U.S. v. Plitman,* 194 F.3d 59, 63 (2d Cir.1999). According to the *Plitman* court:

[t]he first category involves rights that defense counsel may waive on behalf of defendant because they concern strate-

gic and tactical matters such as the selective introduction of evidence, stipulations, objections and pre-trial motions. The second category involves rights that only the defendant himself may waive because they are "personal" and include matters like pleading guilty, waiving a jury trial, pursuing an appeal, and deciding to testify.

*Id.* Except for the one exception I described above with respect to structure, the recorded conversations contain only information that could be used as evidence. If counsel may stipulate to evidence at trial, he certainly may allow the government access to information that might potentially be used as evidence at trial. As mentioned above, Breitbart stated in a sealed proceeding that he was comfortable allowing the government's trial attorneys to listen to the recordings, and that "we will raise no objection during the course of the trial with regard to the tapes." Tr. 2/12 at 28. Even if the recordings had disclosed defense strategy, which I hold that they did not, I find that Breitbart's waiver would have been sufficient to permit the lifting of the government's firewall and allow the prosecutors and FBI agents to listen to the recordings without harming the defendants' Sixth Amendment rights.[9]

### III. Suppression

In addition to their claim that Tartaglione's recordings created a "spy in the defense camp" issue that violated the defendants' Sixth Amendment rights, the

---

**9.** I find particularly disingenuous Breitbart's claim that he is not in a position as counsel to make decisions that will expose the government to co-defense strategy. Breitbart has spoken publicly about defense strategy before, apparently without his client's personal, knowing and intelligent waiver. For example, on October 1, 2003, New York Newsday reported strategy regarding pretrial motions concerning the murder of Dominick "Sonny Black" Napolitano, a Bonnano made member

in whose death Massino is alleged to have been involved. The article states that "... David Breitbart and his co-counsel Diarmuid White said they are researching whether prosecutors can bring such a prosecution in the face of an earlier conspiracy acquittal;" and that "Breitbart indicated he planned to dispute the claim that the corpse found was that of Napolitano." Anthony M. DeStefano, *Reputed Mob Boss Indicted,* New York Newsday, Oct. 1, 2003, at A23.

defendants claim that incriminating statements are included on the tapes. Specifically, Leemon identifies Lino as a person who committed one of the acts charged in the indictment. ML3 at 7. For this reason, the defendants move to suppress the tapes.

At first, the government did object to suppression based on Breitbart's voluntary waiver. GL1 at 8. During the hearing on March 3, however, the government withdrew this objection, stating that "[a]t the end of the day, if the remedy is that the government not use the tapes at trial, we're not going—we will most likely not sure the tapes in our case in chief. If that is the remedy the court suggests, that's fine." Tr. 3/3 at 38.

As the government does not object to the tapes being suppressed, and so as to avoid any potential problems that might result from the use of these recordings during trial, I order that they be sealed and suppressed at least until the charges against Massino and Lino are resolved.

## IV. Conclusion

The defendants' motions to dismiss indictment 02–CR–307, to disqualify Greg Andres, to preclude Tartaglione's testimony at trial and to expedite all 3500 materials are DENIED. The defendants' motions to seal and suppress the consensual recordings until the charges against Massino and Lino are resolved is GRANTED.

SO ORDERED.