No. 18-1841
*United States v. Chandler*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021

(Argued:  December 7, 2021     Decided:  December 27, 2022)

Docket No. 18-1841

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

ANDRE CHANDLER, AKA MAC DRE,

*Defendant-Appellant.*

B e f o r e :

LYNCH, CARNEY, and SULLIVAN, *Circuit Judges.*

Defendant-Appellant Andre Chandler appeals from a 2018 judgment of conviction entered after a jury found him guilty on counts related to a drug distribution conspiracy, the discharge of a firearm during a drug trafficking crime, and the unlawful possession of a firearm. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(c)(1)(A)(iii). Chandler committed these crimes while on supervised release following prior convictions and is currently serving a 354-month term of imprisonment. On appeal, Chandler asserts primarily that two alleged district court errors require vacatur of his conviction. First, relying on *Weatherford v. Bursey*, 429

U.S. 545 (1977), Chandler contends that the government violated his Sixth Amendment rights by eliciting testimony from his former cellmate concerning what Chandler told the cellmate about Chandler's planned defense. Second, Chandler submits that his Fourth Amendment rights were violated when the officer supervising Chandler during Chandler's period of supervised release coordinated a search of his residence and rental car. Accordingly, Chandler argues that the district court erred by admitting his former cellmate's testimony and evidence seized during the search of his residence and rental car.

On plain error review of the Sixth Amendment claim, we identify no error, never mind plain error. Nothing in the record suggests that the government learned privileged information or intentionally invaded Chandler's relationship with his attorney. On de novo review of the Fourth Amendment challenge, we conclude that the district court properly denied Chandler's motion to suppress. The officer monitoring Chandler had reasonable suspicion to search Chandler's residence and rental car based on credible reports that Chandler unlawfully possessed a firearm and was engaged in drug trafficking.

AFFIRMED.

---------------

DAVID K. KESSLER, (Kevin Trowel, *on the brief*), *for* Mark J. Lesko, Acting United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

JAMESA J. DRAKE, Drake Law, LLC, Auburn, ME, *for Defendant-Appellant*.

---------------

CARNEY, *Circuit Judge*:

In this appeal, we address questions concerning the scope of a defendant's Sixth Amendment right to effective assistance of counsel when the government presents a witness to whom the defendant has volunteered his thoughts about defense strategy and who, after learning the defendant's thoughts, agrees to testify for the government. We also consider a Fourth Amendment claim raised in the context of a search

2

conducted of the home and car of an individual serving a term of supervised release. On review, we find no error, and we affirm the judgment of conviction.

In October 2016, following an eight-day trial, a jury found Defendant-Appellant Andre Chandler guilty of seven counts related to dealing in cocaine and heroin and related firearm usage in 2014 and early 2015: conspiracy to distribute cocaine base and heroin, *see* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846 (Count 1); discharge of a firearm during a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A)(iii) (Count 2); three counts of unlawful possession of firearms, *see* 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Counts 3 through 5); and possession of cocaine base, heroin, oxycodone, and hydrocodone with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Counts 6 and 7). Chandler was found to have committed these crimes while on a three-year period of supervised release begun in 2014. This period of supervised release was imposed as part of the sentence Chandler received in 2012 for violating the terms of a previous period of supervision. He is currently serving a 354-month term of imprisonment imposed in 2018 by the United States District Court for the Eastern District of New York (Azrack, *J.*) upon his conviction of the seven counts.

Chandler now appeals from the district court's 2018 judgment. In his counseled brief, Chandler asserts primarily that vacatur of his conviction is required because of two alleged errors by the district court. First, relying on *Weatherford v. Bursey*, 429 U.S. 545 (1977), Chandler argues for the first time on appeal that the government violated the Sixth Amendment when it elicited testimony about his trial strategy from his temporary cellmate, Shedret Whithead, who became a cooperating witness after their period of cell-sharing ended. Second, Chandler contends that the district court erred by failing to suppress evidence discovered during a search of his residence and rental car conducted while Chandler was on supervised release. He challenges as inadequate the grounds cited by the officers for undertaking the search. *See United States v. Chandler*,

2016 WL 4076875 (E.D.N.Y. Aug. 1, 2016) (Azrack, *J.*), *adopting and aff'g* 2016 WL 11481202 (E.D.N.Y. June 16, 2016) (Locke, *Mag. J.*) (R&R). We reject both arguments.

As to Chandler's Sixth Amendment claim, we conclude that the district court did not err, never mind plainly err, by admitting the cellmate's testimony. Nothing in the record suggests that, through Whithead, the government intentionally invaded Chandler's relationship with his attorney or learned privileged information: Whithead was not a government agent when Chandler disclosed his thoughts about a defense to Whithead; and Chandler has not shown that the plans revealed by Chandler to Whithead were privileged or, to the extent that any privilege did apply, that it was not waived.

We further conclude that the district court properly denied Chandler's motion to suppress. The probation officer in charge of monitoring Chandler's supervised release had reasonable suspicion to search Chandler's residence and rental car based on credible and specific reports that Chandler, a felon and on supervised release, unlawfully possessed a firearm and was again engaged in drug trafficking. Chandler's reliance on cases concerning probable cause to conduct a warrantless search of a residence are inapposite.

We therefore AFFIRM the district court's judgment of conviction.

**BACKGROUND[1]**

**I.      Events leading to the search and Chandler's arrest**

In July 2014, Chandler was released from federal custody following a 24-month term of imprisonment imposed on him for his violation of the conditions of a term of

---

[1] Except as otherwise noted, the facts as set forth here are drawn from the Magistrate Judge's account, which was adopted by the district court and which are not disputed by either party.

supervised release.[2] Chandler then began a new, three-year term of supervised release. Senior United States Probation Officer Dennis Stickley was assigned to supervise Chandler.

Under the terms of Chandler's supervised release, he was required to "submit his person, residence, vehicle or place of business to a search if the Probation Department has reasonable belief [that] contraband is present." Amended Judgment, *United States v. Chandler*, 2:02-cr-938, Dkt. No. 31 (reinstating Conditions of Supervised Release first imposed on May 16, 2003, *see id.* Dkt. No. 17). He also was obligated to "permit a probation officer to visit him [] at any time at home or elsewhere" and to "permit confiscation of any contraband observed in plain view of the probation officer." *Id.* at 3. Among other standard conditions of supervision, Chandler was also bound "not [to] commit another federal, state, or local crime," and not "unlawfully [to] possess a controlled substance" or to "possess a firearm." *Id.*

At the start of his period of supervised release, Chandler initially lived with his wife, Tashikha Chandler ("Mrs. Chandler").[3] Sometime in November 2014, he notified Officer Stickley that his residence had changed to a house on Anderson Road in Springfield Gardens, Queens, where he lived with his girlfriend. Later in November,

---

[2] More specifically, in 2003, Chandler received a sentence of 78 months' imprisonment and 5 years' supervised release after he pleaded guilty to possessing cocaine base with intent to distribute. In August 2007, Chandler was released to a halfway house, which he soon fled. After being recaptured and pleading guilty to an escape charge, Chandler was sentenced in April 2009 to nine months' further incarceration and a new term of supervised release. In August 2012, Chandler was arrested for violating the terms of his supervised release by criminally possessing a narcotic drug and committing assault with intent to cause physical injury to an officer. He pleaded guilty to those charges and was accordingly sentenced to 24 months' imprisonment and 3 years of supervised release. It was during that third term of supervised release, imposed in 2012, that he committed the crimes described above, leading to the conviction from which he now appeals.

[3] Mrs. Chandler's first name also appears in the record spelled "Tashica."

Mrs. Chandler told Officer Stickley that Chandler had begun to threaten her. Mrs. Chandler alleged (among other things) that in late November, Chandler had said he would "come to her house and 'air this place out[,]'" a phrase that she took as a physical threat. App'x at 179. On the basis of those reported threats, she obtained a state order of protection. On January 5, 2015, Officer Stickley learned that Chandler had been arrested for violating that order of protection.

Related to these developments, Mrs. Chandler described to Officer Stickley an incident that had occurred at her uncle's house on January 1. She said that when Chandler arrived there, he began to argue with her, and—as Stickley later recalled Mrs. Chandler saying—"maneuver[ed] . . . an area along his hip to make it seem like he was in possession of a firearm."[4] App'x at 182. Mrs. Chandler also reported to Officer Stickley her understanding that, on January 4, Chandler had brandished a firearm during a conversation with her uncle. Finally, she gave Officer Stickley a phone number that she said Chandler was using to sell drugs and informed him that Chandler, who had been driving a rental car, had in the past habitually kept a gun in the center console between the car's front seats.

Based on these reports, Officer Stickley prepared a written operations plan to search the Anderson Road residence and Chandler's vehicle under the authority of the terms of Chandler's supervised release. In the plan, he recorded his conclusion that reasonable suspicion supported the search because of (1) Chandler's history of violence and weapons possession; (2) Chandler's arrest for violating an order of protection; and (3) the fact that a confidential source had advised Officer Stickley that Chandler possessed a firearm. The search was scheduled for January 13, 2015.

---

[4] Mrs. Chandler's uncle later corroborated her account of the January 1 incident to Officer Stickley. App'x at 190–91.

On January 12, Mrs. Chandler sent Officer Stickley a text message reporting that, two days earlier on January 10, Chandler had "pistol-whipped" a member of a rival gang at a Long Island nightclub. She also informed Officer Stickley that someone had fired a gun at the club that night. Officer Stickley promptly followed up with a Nassau County detective at the police precinct where the club was located. The detective confirmed that an altercation between two gang members had occurred at the club on the night Mrs. Chandler identified and that an individual had discharged a firearm during the altercation.

On January 13, Officer Stickley—joined by other federal probation officers and officers of the New York City Police Department ("NYPD")—conducted the planned search of the Anderson Road residence. Inside the home, the officers found (1) a loaded 9 mm Smith & Wesson handgun, found under a mattress in a child's bedroom; (2) a loaded 9 mm handgun, found in a safe inside Chandler's bedroom; (3) a bag containing 80 glassine bags of heroin, also found in Chandler's bedroom; (4) a bag containing cocaine, found in a bedroom; and (5) a set of car keys and safe keys, found in a nightstand in Chandler's bedroom next to the side of the bed where (as they later learned) Chandler slept.

Attached to the car keys was a plastic sleeve that displayed the make, model, color, and license plate number of a rental car. NYPD officers located that car parked a block away from the house. Searching the car, the officers found a firearm in the center console, and elsewhere in the car, they located a brown bag filled with pills and a powdery substance, a scale, and a cell phone.

Not long after, members of the NYPD arrested Chandler.

## II. The December 2014 shooting

On December 13, 2014, a month before the search of the Anderson Road residence, Detective Thomas Dluginski of the Nassau County Police Department responded to a reported shooting of an individual at a location in Hempstead, New York, at about 3:30 a.m. Detective Dluginski later testified during a hearing on Chandler's motion to suppress that the shooting victim was no longer present when he arrived at the scene, but that Dluginski was able to interview him at a nearby hospital. The victim, Hashim Handfield, did not identify the perpetrator to Dluginski. A few days later, however, another detective informed Detective Dluginski that a confidential source had identified Chandler as the shooter. On December 29, Detective Dluginski prepared a six-person photo array, which included a picture of Chandler, "in the hopes of identifying [a] suspect." App'x at 75.

At the motion to suppress hearing, Detective Dluginski testified that two witnesses identified Chandler as the perpetrator. The first identification occurred on January 30, 2015, when Dluginski overheard an arrestee at the Hempstead Armory report that he knew who committed the December 2014 shooting. The witness told Dluginski that he was present at the shooting, and he orally identified the shooter as "Mac Dre," whom he knew as a drug dealer. *Id.* at 77. Dluginski then showed the witness the December 29 photo array, and the witness identified Chandler as the shooter. Dluginski testified that "Mac Dre" was Chandler's "nickname." *Id*. at 70.

The second identification occurred on February 19, 2015. Detective Dluginski testified that a detective from the Nassau County Homicide Squad informed him of a second witness, who had also named Chandler as the perpetrator of the December 2014 shooting. Detective Dluginski prepared a second photo array, placing Chandler's photo in a different location from the one it had occupied in the previous array. When

8

interviewed and presented with the array, the witness—who said that he knew Chandler from selling drugs with him in the past—identified Chandler as the shooter.

### III.   The superseding indictment and pre-trial motions

On June 16, 2015, the government filed a superseding indictment that charged Chandler with seven counts. In Count One, the government alleged that between July 2014 and January 2015, Chandler had conspired with others to distribute cocaine base and heroin. In Count Two, the government charged Chandler with discharging a firearm in relation to a drug trafficking crime for allegedly shooting a rival drug dealer on December 13, 2014. Counts Three through Five charged Chandler with unlawfully possessing a firearm (one count for each gun recovered from Chandler's residence and the rental car during the January 13 search). Counts Six and Seven charged Chandler with possessing with intent to distribute the cocaine base, heroin, oxycodone, and hydrocodone that officers located during the January 13 search. After his indictment, Chandler moved unsuccessfully to suppress the evidence found during the searches of his house and rental car, with the district court concluding that reasonable suspicion supported the searches.[5]

The district court also conducted a hearing "to determine, under *Massiah v. United States*, 377 U.S. 201 (1964), and its progeny, whether and under what circumstances introduction of testimony regarding conversations between a

---

[5] Upon referral by the district court (Spatt, *J.*) for an evidentiary hearing with respect to certain issues raised by the motion to suppress, App'x at 32–63, Magistrate Judge Steven I. Locke recommended that the district court deny the motion. He concluded that the "information received by Officer Stickley, whom the Court finds testified credibly, gave rise to a reasonable suspicion that criminal activity may be afoot sufficient to justify the Anderson House search" and the search of the rental car. *Chandler*, 2016 WL 11481202, at *7–8 (internal quotation marks omitted). Rejecting Chandler's objections, the district court adopted Magistrate Judge Locke's report and recommendation. *See Chandler*, 2016 WL 4076875, at *2–3.

cooperating jailhouse witness (the 'Cooperating Witness') and defendant would be appropriate." App'x at 365; *see Massiah*, 377 U.S. at 207 (holding that the government is not constitutionally permitted to interrogate, even through an informant, a person under indictment who has counsel). Based on testimony presented at that hearing, the district court found that Chandler and the Cooperating Witness, Whithead, "shared a cell in MDC [the Metropolitan Detention Center] between January 14, 2016 and January 26, 2016," and that in February 2016, after their approximately two-week period of cohabitation ended, Whithead's counsel first emailed the prosecution to suggest a meeting. App'x at 366. Members of the prosecution team first met with Whithead in April 2016, and on that occasion, he "provided information to the Government regarding defendant and his current charges." *Id.*

The court found that all six government witnesses (prosecutors and detectives) "testified credibly." *Id*. at 368. On the basis of the evidence before it, the court concluded that "[t]he Cooperating Witness was not acting as an agent of the government because he obtained the information before becoming an informant." *Id*. Therefore, it ruled that "the statements made by defendant to the Cooperating Witness were not obtained in violation of the Sixth Amendment." *Id.*

## IV.    The trial

Trial began in late September 2016.

To prove the 2014–2015 drug conspiracy that was charged in Count One, the government called three of Chandler's former customers. Pamela Heath testified that between the summer of 2014 and January 2015, Chandler sold her heroin multiple times each week and discussed his drug dealing activities with her. Ramel Floyd testified that between July 2014 and October 2014, he purchased crack cocaine and heroin approximately twice a day from Chandler in quantities sufficient to resell those drugs to

10

other customers. Tiffany Peal testified that Chandler offered to sell her crack cocaine and heroin in 2014.

Regarding the firearm offense charged in Count Two, the government called Handfield, the shooting victim, who testified that he was selling drugs in Hempstead, New York on December 13, 2014, when he witnessed a Mustang car approach him at around 3:30 a.m. Handfield observed a woman in the passenger seat and a man in the driver's seat. When Handfield asked the driver if "he needed anything," the driver said nothing and shot Handfield in the abdomen. After Handfield fell to the ground, the driver fired a second shot, which hit him in the leg. Handfield ran behind a shed "[f]or fear of [his] life" and immediately called law enforcement. App'x at 732–33. The government also called Peal, who testified that on December 13, 2014, at around 3:30 a.m., she was standing nearby and witnessed Chandler shoot a drug dealer multiple times on Linden Avenue in Hempstead, New York. *Id.* at 761–63, 766.

With respect to Counts Three through Seven, which concerned Chandler's unlawful possession of guns and possession of various narcotics with intent to distribute, the government introduced physical evidence. This included physical evidence retrieved from the searches of Chandler's house and car, as well as photographs of the pills, drug paraphernalia, and firearms recovered from the searches. Officer Stickley testified about the search and the events described earlier. In addition, expert ballistics testimony tied a bullet from the December 13 shooting scene and a bullet recovered from Handfield's body to the Smith & Wesson found under the child's mattress in Chandler's residence. Finally, cell tower data placed Chandler's phone in the vicinity of his residence at 2:30 a.m. on the day of the shooting, in the vicinity of the location of the shooting in Hempstead by 3:30 a.m., and then back in the vicinity of the residence by 4:00 a.m. That evidence was consistent with the theory that Chandler drove from his residence to the scene of the shooting and back on the night when

11

Handfield was shot. The government also introduced the testimony of non-law-enforcement witnesses regarding their dealings with Chandler in various drug transactions and his use of guns.

On the sixth day of trial, the government adduced the testimony of Shedret Whithead. Whithead testified that Chandler had asked to be bunked with Whithead, and Whithead had agreed, because they had known each other since they were children. Whithead testified further that, while he and Chandler were cellmates, Chandler admitted to him that he possessed firearms and that he had shot an individual in Hempstead, New York, who had been selling drugs in Chandler's territory. Chandler also revealed to Whithead his planned litigation strategy to challenge the admissibility of, and cast doubt upon, specific elements of the government's evidence. Specifically, Whithead testified that Chandler told him that he planned to achieve this by arguing that the searches of his house and rental car were botched, that the DNA found on the gun seized from the rental car was the result of innocently transporting it from one location to another, and that his alibi for the night of the shooting was that he was at a party with his girlfriend.

After deliberation, the jury rendered a verdict of guilty on all counts.

The district court sentenced Chandler principally to 204 months' imprisonment for discharging a firearm during a drug trafficking crime. It also imposed sentences of 150 and 120 months' imprisonment for the other drug- and firearms-related counts of conviction, respectively, to run concurrently with each other and consecutive to the 204 months' sentence that Chandler received for Count Two. The final sentence of incarceration amounted to a total of 354 months.

Chandler then timely brought this appeal.

**DISCUSSION**

Chandler now challenges his conviction primarily on two grounds. First, he submits that the government violated his Sixth Amendment rights by eliciting trial testimony from Whithead about his defense strategy. Second, he contends that law enforcement officers unlawfully searched his home and rental car, and that the district court accordingly erred by failing to suppress the evidence collected in the course of those searches.

## I. Sixth Amendment claim

Chandler contends that the admission of portions of Whithead's testimony violated his Sixth Amendment right to effective assistance of counsel by disclosing details regarding his trial strategy to the jury. Citing remarks by the Supreme Court in *Weatherford*, he submits that the violation occurred when the prosecutor "purposefully asked [Whithead]—in front of the jurors—how [Chandler] planned to defend against evidence that he possessed guns; evidence that his DNA was found on guns; and GPS location evidence," and Whithead was permitted to answer. Appellant's Br. at 11. Chandler further claims to have been prejudiced by this testimony, even viewed in light of the record as a whole.

Because Chandler did not raise his Sixth Amendment challenge to Whithead's testimony in the district court,[6] we review his argument for plain error. Under that standard,

---

[6] At the *Massiah* hearing conducted in the district court, Chandler did not contest the credibility findings or the legal ruling there made by the district court, nor does he here. Rather, he has crafted a new argument based on *Weatherford*, as set forth above. *See* Appellant's Br. at 19–20 ("In our case, the district court specifically found that there was no *Massiah* violation. Defendant does not ask this Court to revisit that ruling. . . . However the government came to know from Whithead about defendant's trial strategy, this evidence was inadmissible at trial."). Chandler

> [we may] correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). An error "affects the defendant's substantial rights when it is prejudicial—that is, when there is a 'reasonable probability' that the error affected the outcome of the proceeding." *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81–82 (2004)). The appellant bears the burden of establishing all four criteria. *Id.*

## A. *Weatherford* **and its progeny: the relevant Sixth Amendment framework**

Chandler derives his Sixth Amendment claim from the Supreme Court's 1977 decision in *Weatherford*. There, the plaintiff, Bursey, was convicted of malicious destruction of property. *See Bursey v. Weatherford*, 528 F.2d 483, 485 (4th Cir. 1975), *rev'd*, 429 U.S. 545 (1977). Weatherford, a state law enforcement agent who had participated in the vandalism while working undercover, was arrested and charged as Bursey's co-defendant. As a co-defendant, Bursey invited Weatherford to attend several meetings between Bursey and his attorney as they prepared for the approaching criminal trial. Weatherford did so without revealing his status as a government agent. *Weatherford*, 429 U.S at 547–48.

---

concedes on appeal that he did not properly object at trial to the introduction of litigation-strategy evidence. *See* Appellant's Br. at 18.

14

After serving his sentence, Bursey sued Weatherford for damages under 42 U.S.C. § 1983, alleging that Weatherford had communicated to the state prosecutors the defense strategies and plans discussed at those meetings, and that—through those communications—Weatherford had deprived Bursey of his Sixth and Fourteenth Amendment rights to effective assistance of counsel. *Id.* at 549.

The Supreme Court found no Sixth Amendment violation. The record, it said, did not show that Weatherford had disclosed to the government "trial plans, strategy, or anything having to do with the criminal action pending against plaintiff." *Id.* at 548, 555–57. Rather, the record reflected that Weatherford's mere presence at the meetings (indeed, upon Bursey's invitation) did not constitute interference with the attorney-client relationship. *Id.* The Court emphasized that Weatherford did not attend the attorney-client meetings with the intention of gathering information for the prosecution and that Weatherford did not in fact pass along any privileged information to the prosecutors; the record showed only that Weatherford had joined those meetings to avoid jeopardizing his cover. *Id.* at 557.

In its ruling, the Court contrasted the situation then at bar with a hypothetical case in which it was shown that the government deliberately interfered with the relationship between a defendant and his counsel. *Id.* at 554–57. For instance, if in using an informant the government's "purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship or [if] the informant has assumed for himself that task," and the informant communicated that information to the prosecution, then the defendant would have a "stronger" argument for a Sixth Amendment violation. *Id.* at 554, 557.

In the 45 years since *Weatherford* was decided, this Circuit has never found a *Weatherford* violation. Shortly after *Weatherford*, we ruled in *Klein v. Smith* that the government did not unconstitutionally intrude on a defendant's attorney-client

15

relationship when a co-defendant retained the same law firm representing the primary defendant in a murder case and attended defense meetings with jointly retained counsel after having become a cooperator. *See* 559 F.2d 189, 198 (2d Cir. 1977). We ruled that no constitutional violation had occurred because the cooperator in *Klein* "did not convey [to the prosecution] any information concerning petitioner's defense strategy," and he did not obtain "information from [the petitioner's attorneys] which he could convey" to the government. *Id.* We observed that under *Weatherford*, "at least where the intrusion by an 'agent' of the prosecution is unintentional or justifiable," a viable Sixth Amendment claim requires "some communication of valuable information derived from the [cooperator's] intrusion to the prosecutor or his staff in order that there can appear [to be] some realistic possibility of prejudice to the defendant." *Id*. at 197.

Similarly, in *United States v. Dien*, we rejected a Sixth Amendment challenge centered on Dien's allegation that his wife, later revealed to have become a government informant, had attended Dien's trial strategy meetings while a government informant. *See* 609 F.2d 1038, 1043 (2d Cir. 1979), *adhered to on reh'g*, 615 F.2d 10 (2d Cir. 1980). As in *Klein*, we explained that to prove a Sixth Amendment violation where an informant attended defense strategy sessions, a defendant must "establish that privileged information had been passed to the government or that the government had intentionally invaded the attorney client relationship, and resulting prejudice." *Id.* Applying that standard, we rejected Dien's Sixth Amendment claim, reasoning that "the conversations alleged to have been passed on to the government were not confidential, [and] there was no evidence that they were in fact passed on to the government." *Id.*

In like vein, we rejected out-of-hand the asserted need for a hearing on a claimed Sixth Amendment violation in *United States v. Ginsberg*. *See* 758 F.2d 823, 833 (2d Cir. 1985). There, the defendant argued that his Sixth Amendment rights were violated

16

when the government allowed the cooperating witness to "mingle" with Ginsberg and his co-defendants before trial, allowing her to have lunch with them, sit at the defense table during pretrial conferences, and listen to the pretrial arguments. Defense counsel requested that the district court "hold some sort of hearing . . . as to why the Government allowed [the individual], after she became a cooperating witness," to do so. *Id.* at 832. We affirmed the district court's determination that no hearing was required. In light of *Weatherford*, we reaffirmed that "[w]here the presence of the government's agent or informant at [a] defense conference is either unintentional or justified by the necessity of protecting the informant's identity, there can be no violation of the sixth amendment without some communication of valuable information derived from the intrusion to the government: absent such communication, there exists no realistic possibility of either prejudice to the defense or benefit to the government." *Id.* at 833 (citations omitted).

We now proceed to apply these principles on plain error review.

### B.    Chandler has not established a Sixth Amendment violation

Chandler falls short of establishing a Sixth Amendment violation on this record. The district court did not err by allowing Whithead's testimony.

Since Whithead was not a government informant when Chandler spoke to him about Chandler's expected trial strategy, the government did not intrude on the attorney-client relationship. That is fatal to his Sixth Amendment claim. As recounted above, the district court conducted a hearing before trial to determine whether Whithead acted as a government agent when he was Chandler's cellmate in January 2016, *see Massiah*, 377 U.S. at 203-07, and concluded that he did not. Central to that determination was the district court's observation that "[t]here is no evidence that any member of the prosecution team had heard of, met with, or spoken to [Whithead] prior

17

to February 2016." App'x at 368. Chandler does not challenge that conclusion on appeal. Thus, Chandler does not claim, and the record does not show, that the government planted Whithead in Chandler's cell as a spy, or otherwise used him to elicit any information from Chandler or to intrude on Chandler's relationship with counsel. The record reflects that Whithead was bunked with Chandler not at the government's direction, but at *Chandler's* request, because Chandler and Whithead had a prior relationship. Chandler freely shared his thoughts about his defense when Whithead had no cooperator-type or other relationship with the government (indeed, Whithead had not by that point even contacted, or been contacted by, the government). Only after Whithead and Chandler were no longer cellmates did that relationship develop—and it did so at Whithead's request. Chandler does not dispute the government's portrayal that he shared his defense plan with Whithead of his own volition, and demonstrably before Whithead became a cooperator.

By contrast, what made the Sixth Amendment claims in *Klein*, *Dien*, and *Ginsberg* even colorable was that in each of those cases, the government informant or cooperating witness allegedly obtained privileged information, or invaded the defendant's attorney-client relationship, after he or she had an already established relationship with the government, thus possibly reflecting a government intention to intrude. For instance, in *Ginsberg*, the defendant alleged that the government's witness sat "at the defense table during pre-trial court conferences . . . all the while acting as a 'spy in the defense camp.'" *Ginsberg*, 758 F.2d at 832; *see also Klein*, 559 F.2d at 198 (addressing, on habeas review, the allegation that a cooperating witness intruded on the petitioner's attorney-client relationship because, after becoming an informant, he continued to be represented by the same law firm as the petitioner for six months). No such circumstance is present here.

Moreover, Chandler does not identify any basis in the record for finding that Whithead ever interacted with Chandler's counsel, overheard any discussions between Chandler and his attorney, or otherwise intruded on the attorney-client relationship. Instead, Chandler asserts only that Whithead eventually relayed to the government what Chandler voluntarily disclosed to him. Indeed, as far as the record reveals, what Chandler told Whithead about his defense was far more likely to be Chandler's own thoughts than advice received from counsel, because it would have been unethical for an attorney to advise at least some of the trial strategy disclosed by Chandler.

As explained above, Whithead testified that Chandler told him about Chandler's planned approach to two prosecution issues: (1) the legality of the government's search of Chandler's residence, and (2) how to rebut the implications of the government's cell-tower data evidence placing Chandler at the scene of the December 2014 shooting. Whithead recounted that Chandler had said he would suggest that his DNA was somehow transferred to the firearm, and that he would present an alibi witness for the night of the club shooting.

On the government's direct examination, Whithead gave the following testimony regarding what he had learned about the planned defense strategy concerning the search:

> **Q**: Now, did you have any other discussions about the gun or guns, and [Chandler's] concern about the gun or guns recovered? . . .

> **A**: Yes, I did, ma'am.

> **Q**: Could you tell the jury and the Judge what those discussions were?

> **A**: He was scared that he knew that the gun that he used for the shooting had his DNA on it.

19

**Q**: And what did he tell you he was going to do about that?

**A**: He said he was going to argue the fact that the search was botched, and that the guns where they was found and the photographs were taken in a place where they were found that they shouldn't be in there.

**Q**: So, [Chandler] told you he was going to argue the search was botched; is that right?

**A**: Correct, ma'am.

**Q**: And how did that – how did he tell you that he was going to explain his DNA on this gun?

**A**: From moving it from place to place, DNA transfer.

**Q**: Did he tell you the gun actually got a DNA [sic] because it was transferred or because he touched those guns?

**A**: Because he used the gun during the shooting.

App'x at 795.

As to the second issue—Chandler's alibi on the night of the shooting—Whithead gave the following testimony regarding what Chandler had told him:

**Q**: And did he express any concerns to you during that conversation about certain evidence?

**A**: Yes, he did, ma'am, about a cell phone.

**Q**: What did he tell you?

**A**: He told me that the government had information, evidence, to put him at the scene of the shooting, because the cell phone itself came to a cell tower before the shooting.

20

**Q**: And how did he tell you that he was going to fight that evidence?

**A**: He was going to have an alibi that he was at a party with his girlfriend where she's with him.

*Id.* at 796.

To repeat: Chandler gave this information to Whithead of his own volition, in disregard of the confidentiality required to maintain attorney-client privilege. The record does not reflect that these strategies came from a consultation with counsel; we are asked to infer that they may have come from counsel, Appellant's Br. at 30, but any advice to develop a false alibi would likely have been unethical in any event. Unlike the circumstances presented in the cases discussed above, Whithead did not even participate in a meeting with defense counsel or overhear a privileged conversation as a government agent. Indeed, so far as we can see, the only bases that the record provides for inferring any involvement of Chandler's counsel in what Chandler told Whithead are Chandler's references to cell tower data and to items recovered from the Anderson Road residence. This information might—but need not—have been based on government disclosures to Chandler and his counsel about the evidence that would be presented at trial. More fundamentally, statements such as these—voluntarily made by defendants to third parties *who are not agents of the government at the time of their utterance*—are by definition not privileged and cannot be used to establish an "invasion" of the attorney-client relationship *attributable to the government*.[7]

---

[7] We observe that in *United States v. Hamilton*, a case relied on by the government, the Seventh Circuit denied a Sixth Amendment claim in similar circumstances, concluding that even if the information the defendant communicated to his cellmate had been privileged, the defendant waived any such privilege by voluntarily disclosing the confidential information. *See* 19 F.3d 350, 353 (7th Cir. 1994). Chandler argues that *Hamilton* is "distinguishable" and "inapt," Appellant's Reply Br. at 1–2, but he offers no persuasive reason to treat the case as anything but fully consistent with our approach.

We thus see no sound basis for concluding that Whithead's testimony reflected "privileged information [that] [was] passed to the government" that could, if prejudice were shown, provide a basis for a valid Sixth Amendment claim under *Weatherford*. *Dien*, 609 F.2d at 1043. Accordingly, we reject Chandler's Sixth Amendment claim.[8]

## II.   Motion to suppress

Chandler also contests the district court's denial of his motion to suppress evidence recovered from the searches of the Anderson Road residence and of his car,

---

[8] In urging a different result, Chandler proposes a broad rule holding that the government violates the Sixth Amendment *whenever* it uses defense strategy information, even if the method of its acquisition neither ran afoul of the attorney-client privilege nor intruded on the attorney-client relationship. Appellant's Reply Br. at 7–10. In support, he directs our attention to the Third Circuit's statement in *United States v. Costanzo* that a Sixth Amendment violation may occur even "when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant." 740 F.2d 251, 254 (3d Cir. 1984). But the bright-line rule that Chandler urges us to apply is inconsistent with our precedents interpreting *Weatherford*. They hold that a Sixth Amendment violation can occur only if privileged information is given to the government or the government intentionally invades the attorney-client relationship. *See Ginsberg*, 758 F.2d at 833; *Dien*, 609 F.2d at 1043; *Klein*, 559 F.2d at 197. Because the government neither obtained privileged information nor intentionally invaded Chandler's relationship with his attorney, Chandler's Sixth Amendment challenge fails.

In any event, application of the *Costanzo* formulation would not change the result here because Chandler—like the defendant in *Costanzo*—was not unfairly prejudiced as a result of his disclosure of his likely trial strategy. *See Costanzo*, 740 F.2d at 257. First, Whithead's testimony about Chandler's confession that he had possessed guns and shot a rival drug dealer only corroborated a wealth of other adverse evidence against Chandler, and this testimony did not implicate Chandler's Sixth Amendment right to counsel because it concerned his criminal conduct and not his intended trial strategy. Second, although Whithead also testified about Chandler's trial strategy, this information was legally obtained by the prosecution and was not exploited by it. The primary value of Whithead's testimony lay in Chandler's admission of guilt, his evident awareness of the strength of the prosecution's evidence, and his intention to concoct theories to obscure the truth about his actions. And while these portions of Whithead's testimony were certainly damaging to Chandler, it is indisputable that they were properly admitted.

described above. On a challenge to a district court's denial of a motion to suppress evidence, "we review legal conclusions de novo and findings of fact for clear error. We also review de novo mixed questions of law and fact. We pay special deference to the district court's factual determinations going to witness credibility." *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015) (internal quotation marks, citations, and italics omitted).

## A.    Reasonable suspicion to conduct this search

In his counseled brief on appeal, Chandler acknowledges the condition of his supervised release providing that probation officers were entitled to search his house or vehicle "if the Probation Department ha[d] a reasonable belief [that] contraband [was] present." Appellant's Br. at 31.[9] He also concedes that the officers had a reasonable belief that he was engaged in criminal activity *outside* of his home. Chandler contends instead that the Probation Department showed an insufficient *nexus* between his criminal activity and the places searched—his home and his rental car—to provide the requisite reasonable suspicion. He asserts that the officers needed, but lacked, observational or informant-derived evidence to establish a link between the *interior* of his home and car and his drug-trafficking activity and gun possession.

To support his position, Chandler primarily relies on out-of-circuit decisions involving the legitimacy of police searches that are subject to the Fourth Amendment warrant requirement. He first cites the Sixth Circuit's decision in *United States v. Brown*, where the court rejected the issuance of a search warrant for the defendant's home on the ground that the government had failed to present reliable evidence connecting the

---

[9] We proceed on the understanding that the "reasonable belief" standard provided in the Conditions of Supervised Release that governed Chandler's supervision is no different from the "reasonable suspicion" standard referred to by both parties and adopted in *United States v. Knights*, 534 U.S. 112, 121 (2001).

suspected drug dealer's ongoing criminal activity to his residence. *See* 828 F.3d 375, 383 (6th Cir. 2016). The Sixth Circuit explained that it had "never held[] that a suspect's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *Id*. (internal quotation marks and citation omitted).[10] Chandler also cites *United States v. Bain*, where the First Circuit "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." 874 F.3d 1, 23–24 (1st Cir. 2017).

Ordinarily, law enforcement must obtain a warrant supported by probable cause before searching a private residence. *See United States v. Julius*, 610 F.3d 60, 64 (2d Cir. 2010). It is a familiar and welcome rule that "[t]he Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004).

Individuals serving a term of federal supervised release, however, enjoy a diminished right of privacy. *See id*. at 665; *see also United States v. Edelman*, 726 F.3d 305, 310 (2d Cir. 2013) ("[P]ersons on supervised release who sign [waivers] manifest an

[10] Two years after *Brown*, the Sixth Circuit in *Peffer v. Stephens* commented that

> [t]he requirement that there be additional reason to think that evidence of the crime will be found in the criminal's residence is not as onerous as it may appear. A magistrate may infer that the evidence sought is likely to be found in the criminal's residence based on "the type of crime being investigated, the nature of the things to be seized . . . and the normal inferences that may be drawn as to likely hiding places," and "it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there."

880 F.3d 256, 270 (6th Cir. 2018) (quoting *United States v. Williams*, 544 F.3d 683, 686–87 (6th Cir. 2008)).

awareness that supervision can include intrusions into their residence and, thus, have a severely diminished expectation of privacy." (quoting *Newton*, 369 F.3d at 665)); *United States v. Balon*, 384 F.3d 38, 44 (2d Cir. 2004) (explaining that a "diminished expectation of privacy . . . is inherent in the very term *supervised* release" (internal quotation marks omitted) (emphasis in original)). Those expectations are reasonably diminished for an individual on supervised release to enable the government to monitor a released felon's activities while reentering society and to protect the public against the possibility of renewed criminal activity. Thus, the Supreme Court has held that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *United States v. Knights*, 534 U.S. 112, 121 (2001).[11] This is a less demanding standard than the probable cause standard. As we commented in *United States v. Reyes*, "the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release." 283 F.3d 446, 462 (2d Cir. 2002). Accordingly, the supervisee—here,

---

[11] In *United States v. Braggs*, we recently held that state parole officers' warrantless search of a defendant parolee's home—concededly unsupported by reasonable suspicion—was nonetheless consistent with the Fourth Amendment under the Special Needs Doctrine. *See* 5 F.4th 183, 188 (2d Cir. 2021). In *Braggs*, officers executed the search based on an anonymous tip that the parolee may have guns in his house. *Id.* at 184. The government acknowledged that it had "insufficient evidence of wrongdoing by [the parolee] to establish reasonable suspicion for a search." *Id.* We agreed with the government, however, that no violation had occurred, concluding that "the search of [the defendant's] house was reasonably related to the performance of the [parole] officers' duties and therefore constitutionally permissible." *Id.* at 188. We do not apply *Braggs* or the Special Needs Doctrine here, having concluded on the record before us that the search of Chandler's residence and car rested squarely on reasonable suspicion.

Chandler—expressly consents to allow a warrantless search on "reasonable suspicion" instead of "probable cause."

To determine whether officers had reasonable suspicion to justify a search, courts look to the "totality of the circumstances" to determine whether the officer had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). Here, that standard is easily satisfied.

Officer Stickley had received reports of Chandler's drug trafficking and firearm use from various sources. Those reports involved conduct that occurred outside of Chandler's home as well as the display of a firearm in a family member's home, and Mrs. Chandler's account that Chandler "maneuver[ed] . . . his hip to make it seem like he was in possession of a firearm," App'x at 182, and stated that he would "come to her house and 'air this place out[,]'" *id.* at 179. Mrs. Chandler additionally informed Officer Stickley that Chandler was dealing drugs using a particular phone number, and that he had a past practice of storing his firearm in the center console of his rental car. Officer Stickley therefore received from Mrs. Chandler a "particularized and objective basis for suspecting legal wrongdoing" connected to Chandler's home and rental car—namely, her informed suspicions of Chandler's drug trafficking and possession of firearms. *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). Parts of Mrs. Chandler's statement were further confirmed by the Nassau County Police Department prior to the execution of the searches on January 13. Chandler also had an extensive history of drug dealing and violence, and his past methods of conducting his criminal business were familiar to Officer Stickley. Taken as a whole, these facts readily sufficed to establish reasonable suspicion to search Chandler's residence and vehicle for evidence of related activity. No closer nexus was necessary. *See United States v. Chirino*, 483 F.3d 141, 148–49 (2d Cir. 2007) (concluding that reasonable suspicion supported a warrantless probation

26

search of defendant's bedroom although the search was precipitated by an abuse report concerning a person who was not in the bedroom). In combination, the tip, its confirmation, and the totality of the circumstances "gave rise to a reasonable suspicion that criminal activity 'may be afoot,'" which was sufficient to justify the warrantless search of Chandler's residence and rental car. *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

### B.    Stalking horse

In a further effort to exclude the results of the searches, Chandler contends that the Probation Department impermissibly acted as a "stalking horse" for the NYPD. He asserts that the NYPD was the real law enforcement animator of the searches, but because it lacked probable cause to conduct the searches, it conscripted the federal probation officers with their less demanding standard to conduct the searches. Appellant's Br. at 50–53. The district court rejected that claim as precluded by our precedent. *See United States v. Chandler*, 164 F. Supp. 3d 368, 380–82 (E.D.N.Y. 2016). We do so as well.

It has been argued that "a probation officer may not use his authority to conduct a home visit to help law enforcement officers evade the Fourth Amendment's usual warrant and probable cause requirements for police searches and seizures." *Reyes*, 283 F.3d at 450. As Chandler acknowledges, however, we have ruled that the "stalking horse" theory "is not a valid defense in this Circuit." *Id.* at 463. We see no reason to revisit that ruling here. The Probation Office had reliable, and at least partially confirmed, information about Chandler's renewal of unlawful activities, and therefore had ample reason consistent with its own mission to conduct the searches that Chandler now assails. Chandler was on supervised release for a third time and had demonstrated much experience in the particular field of criminal drug dealing. That the probation officers were assisted by NYPD officers does not suggest that the Probation Office was

acting at the NYPD's direction for its purposes. Accordingly, Chandler's argument for revisiting this rule fails to persuade.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment of conviction.[12]

---

[12] In his *pro se* brief, Chandler provides additional arguments in support of vacating his conviction. These include claims that (1) insufficient evidence supported his conspiracy conviction; (2) the district court should have excluded a Drug Enforcement Administration analyst's trial testimony as a violation of the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004); (3) the trial statements of three eyewitnesses were erroneously admitted into evidence; and (4), the Probation Office miscalculated his Guidelines sentencing range. We have carefully considered these arguments and find in them no basis for reversal. Chandler also argues that his 354-month sentence, which was above the applicable Guidelines range of 240 to 275 months' imprisonment, was substantively unreasonable. We have explained in the past that, "[a]s to substance, we will not substitute our own judgment for the district court's on the question of what is sufficient to meet the [18 U.S.C.] § 3553(a) considerations in any particular case. We will instead set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks and citations omitted). The district court here reasonably concluded that an above-Guidelines sentence was warranted because, among other things, Chandler had repeatedly engaged in criminal conduct on supervised release even after serving significant custodial sentences. Accordingly, we reject Chandler's argument that his sentence was substantively unreasonable.